Receipt # 200699

ORIGINAL

FILED
JUL 13 2004
U.S. COURT OF FEDERAL CLAIMS

ECF

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **LESLIE T. GLADSTONE, AS TRUSTEE OF THE WILLIAM G. TADLOCK, INC. BANKRUPTCY ESTATE,** **Plaintiff,** vs. **UNITED STATES OF AMERICA,** **Defendant.** | Case No. 04-1145C |

## COMPLAINT

1. Plaintiff Leslie T. Gladstone, as Trustee of the William G. Tadlock, Inc. Bankruptcy Estate ("Trustee") brings this action to recover damages incurred from a breach by the United States Government of a contract entered into with the United States Government for the construction of an Enlisted Dining Facility at the Marine Corps Miramar Naval Air Station, San Diego, California ("Miramar").

## JURISDICTION

2. Trustee's claims arise under Section 10(a)(1) of the Contract Disputes Act of 1978, 41 U.S.C. Section 609(a)(1). This court has jurisdiction over such claims under 28 U.S.C. Section 1491(a)(1) and (2).

3. Trustee has a valid Claim, as described below, because:

   1. Trustee's predecessor, William G. Tadlock, Inc., ("Tadlock") submitted a written demand to the Government, which demand was reiterated by the Trustee through the Trustee's counsel;

   2. Initially Tadlock, and now the Trustee, are entitled to receive a response to their Request for Contracting Officer's Final Decision on their Claim, as a matter of right;

3. The Claim demands payment of a sum certain.

4. By virtue of the Contracting Officer's failure to render a final decision on that Claim within sixty days of service of that Claim, the Claim is deemed rejected.

## PARTIES

3. Plaintiff is the Trustee in the matter *In re W.G. Tadlock & Company,* Bankruptcy Case No. 01-10104-A7 pursuant to the Order of the United States Bankruptcy Court, Southern District of California on or about March 13, 2002.

4. Defendant is the UNITED STATES OF AMERICA ("Government"), acting through the Department of the Navy, Southwest Division, Naval Facilities Engineering Command (1220 Pacific Highway, San Diego, California 92132-5190).

## FACTUAL BACKGROUND

5. On September 15, 1997, the Government issued a sealed bid solicitation, Solicitation Number N68711-97-B-1754 for the construction of an Enlisted Dining Facility at the Marine Corps Miramar Naval Air Station, San Diego, California (the "Project").

6. On October 27, 1997, Tadlock, a general contractor and construction company, submitted a bid to construct that dining facility for the fixed price of $6,008,622.00 (the "Contract Price").

7. On February 5, 1998, the Government accepted Tadlock's bid. A contract was thus formed between Tadlock and the Government whereunder Tadlock would construct the dining facility according to detailed drawings, plans and specifications (the "Contract Documents") for the not-to-exceed Contract Price of $6,008,622.00 (the "Contract"). The Government's consideration for the Contract was to be paid to Tadlock in progress payments, as the construction progressed.

8. Pursuant to the Government's acceptance, the construction was to be commenced on February 20, 1998 and completed by March 22, 1999 (the "Contract Completion Date"), within 395 days (the "Contract Performance Period").

9. On February 5, 1998, the Government unilaterally amended the Contract through Modification of Contract No. A00001 to require adherence to Department of Labor Wage Decision No. CA97001-10/17/97, setting wage rates and fringe benefit rates for all workers and craftsmen employed on the Project. The Contract Price remained $6,008,622.00 and the Contract Completion Date remained at March 22, 1999.

10. From the very beginning and throughout the Project, Tadlock's efforts were impeded by unforeseen and/or undisclosed obstacles and complications, which caused construction delays that were not the fault of Tadlock. These obstacles and complications were reported in over 200 Field Notices and at least 89 Prime Cover reports, and necessitated the submission of at least 31 requests for modifications to the Contract. At least ten of those modifications remained unresolved.

11. Throughout the course of the Project, Tadlock was also impeded by numerous errors, omissions and discrepancies in and between the Project plans and specifications and the Project architectural drawings (the "Contract Documents"), which repeatedly caused prolonged delays.

12. The Trustee is informed and believes that the Government accepted the Contract Documents when they were only 90% complete due to time constraints, on the perceived premise that the Government's architects could complete the design during construction.

13. The Government often spent undue time processing and approving the requested modifications to the Contract, causing unnecessary delay in the schedule for completion of the Project. Tadlock often continued work prior to the approval and issuance of such modifications, in a good faith effort to adhere to the Project schedule but at significant financial risk to Tadlock.

14. On March 11, 1998, upon reviewing the attachments to Prime Cover No. 2 from the Food Service Design Consultant requiring numerous adjustments to the food service equipment design drawings and specifications, the Government admitted in writing that the Contract Performance Period would need to be extended to accomplish these adjustments.

15. Although the Government's delay in approving many of the modifications to the Contract, and the additional effort required of Tadlock to effect the changes in Project construction mandated by many of those modifications necessitated extra time for Tadlock to complete the Project, and despite the Government's March 11, 1999 written admission that the Contract Performance Period would need to be extended, the Project Completion Date was extended only one calendar day in all those modifications to the Contract.

16. On and shortly after March 10, 1998, during site demolition, Tadlock found buried cementous material that had not previously been disclosed, necessitating the use of more powerful equipment that performed at a slower pace than anticipated at bid time. Tadlock addressed the existence of this impediment and the necessity for its removal in Field Notice No. 01, dated March 12, 1998.

17. On March 23, 1998, Tadlock issued Field Notice No. 03, reporting that Tadlock had found a previously unknown concrete ductbank encasement bisecting the building site north to south, preventing the rerouting of site utilities according to the Contract drawings.

18. On April 8, 1998, the Navy's Resident Officer in Charge of Construction ("ROICC") acknowledged that the ductbank did interfere with other utilities and did need to be removed.

19. A "temporary fix" was issued by ROICC, directing Tadlock to tunnel under the ductbank. Work was disrupted by the subcontractors' inability to properly gear up the project while attempting to work under and around the ductbank. This disruption delayed progress of site preparation.

20. On April 9, 1998, Tadlock notified the Government in Field Notice No. 015 that the Navy's four-hour maximum water outage requirement was insufficient for the work that was required and needed to be overcome by installation of isolation valves. This effort caused further delay of the Project site preparation.

21. On May 4, 1998, Tadlock reported in Field Notice No. 034 that, when Tadlock attempted to

demolish the existing sewer line, the line was discovered to be encased in concrete along with the water and storm drain lines. During demolition of the sewer line within this joint concrete encasement, the water line was ruptured, causing the expenditure of additional labor and material and additional delay.

22. The ROICC did not respond to Field Notice No. 1 regarding the cementous material that was discovered in early March 1998 until May 11, 1998, at which time the ROICC acknowledged with an Endorsement that the existence of the cementous material warranted a Modification to Contract, with cost to be negotiated. The ROICC requested a responsive proposal from Tadlock not later than June 1, 1998.

23. The actual completion of underground site utilities for the Project was delayed for forty-three days due to the above-described discovery of the existence of the cementous soils, the unknown ductbank, and the concrete encasements.

24. On May 15, 1998, Tadlock and the Government entered into Modification of Contract No. A00002, whereby the Government agreed to reimburse Tadlock one-half of the cost of a Partnering Workshop which was held at commencement of Project construction. As a result, the total Contract Price was increased by $1,608.65, from $6,008,622.00 to $6,010,230.65. The Contract Performance Period remained unchanged.

25. On May 21, 1998, the Government notified Tadlock that Tadlock would not be allowed to work during a five-day "No Work Window" from August 12-16, 1998, to accommodate the MCAS Miramar Air Show, and that Tadlock would be required to perform cleanup and security measures prior to that period of time. However, the Government did not offer any extension of the Contract Performance Period to compensate for this mandatory delay.

26. While Tadlock was excavating through hard pan material to install a grease interceptor tank, the ROICC informed Tadlock that the ROICC wanted the footings for the buildings to bear on

formational soil, despite the fact that the Contract Documents did not require this feature.

27. Tadlock therefore conducted an exploratory excavation in the vicinity of the F-3 and F-4 footings.

28. As a result of the exploratory excavation and after a week of discussions, Tadlock issued Field Notice No. 56 on June 4, 1998 addressing the Government's request that all footings bear on formational soil.

29. To comply with Field Notice No. 56, Tadlock was required to conduct additional excavation for some footings. For this reason, and because the ROICC also recommended that the deepened footings be filled with slurry, Tadlock believed Field Notice No. 56 mandated a changed condition and requested a meeting prior to conducting the footing excavation to resolve the issue.

30. To avoid delay with the Project and at the verbal request of the ROICC, Tadlock proceeded to complete the work on the footings through a hired subcontractor, despite the lack of any official response from the ROICC to Field Notice No. 56. The overexcavation of footings and subsequent backfill with concrete slurry extended a Project task intended to be completed in fifteen days into twenty-three days, adding eight days of delay.

31. The ROICC did not respond to Field Notice No. 56 until August 13, 1998, when Michael R. McGaw, the Navy Project Engineer, submitted a memorandum to Tadlock challenging costs that had already been incurred by Tadlock to comply with the Government's requests for over-excavation of the footings and subsequent backfill. By this time, Tadlock had already complied with, and had incurred the expenditures for, these requests by the Government.

32. On or about June 19, 1998, Tadlock commenced the masonry phase of the Project ("Masonry") with the placement of the first section of footings. In conjunction with the Masonry work, Tadlock issued various Field Notices including Nos. 8 and 58, which addressed a number of errors and omissions in the Contract Documents.

33. Tadlock forwarded Field Notice No. 58 to the ROICC eleven days prior to the mobilization of Masonry, but the ROICC did not respond with an answer until July 7, 1998, eighteen days after work had proceeded on Masonry.

34. Tadlock was also required to issue Field Notices Nos. 67, on June 22, 1998; and 69, on June 23, 1998; describing errors and insufficient details in the Project drawings, and conflicts between Masonry and other work. These errors and omissions in the Project drawings and conflicts contributed to the delay of at least thirty-two days in completion of Masonry.

35. On or about June 19, 1998, Tadlock also issued Prime Cover No. 9, which requested that the Contract Performance Period be extended an additional five days to add control joints to the Masonry walls.

36. On June 26, 1998, the Government issued a Memorandum to Tadlock alleging undue road obstruction due to Project activities. That Memorandum was followed with a Non-Compliance Log dated July 13, 1998 alleging road obstructions.

37. On June 29, 1998, Tadlock and its subcontractors arrived at the Project site, only to find the electrical power out. The Government had given Tadlock no advance warning to enable Tadlock to implement pre-planning for temporary power provisions. Tadlock was required to rent temporary generators and the workday was largely unproductive. The Government acknowledged this power outage in correspondence dated July 1, 1998 but did not offer any extension of the Contract Performance Period.

38. On June 29, 1998, Tadlock issued Field Notice No. 76, which addressed concerns voiced by Tadlock's electrical subcontractor, DYNA Electric, over numerous omissions in the Contract Documents as to the electrical requirements for the food service equipment.

39. On or about June 30, 1998, Tadlock completed additional work required by Prime Cover No. 33, specifically to excavate the building footings, place slurry into the footings and haul off

additional dirt and debris. However, the ROICC did not pay Tadlock for this work until September 4, 1998.

40. On or about July 2, 1998, Tadlock issued Field Notice No. 77, which addressed further details of errors and omissions in the Construction Documents, specifically additional instances of missing electrical connections for food service equipment. Discussions and communications focused upon resolution of the issues addressed in Field Notice No. 77 continued through January 1999.

41. On July 14, 1998, Tadlock responded in writing showing that the allegations in a Government Non-Compliance Log dated July 13, 1998 were not warranted.

42. On July 22, 1998, the Government proposed Prime Cover No. 23, to change limestone flooring to domestic porcelain stone. In this written proposal, the Government acknowledged the potential need for additional contract time.

43. On August 3, 1998, the Government requested Prime Cover No. 24, addressing changes in HVAC equipment and electrical work. In its written proposal, the Government suggested that additional contract time might be required. Tadlock believed that the request was not sufficiently specific and that it mandated the preparation of additional schematic drawings.

44. On August 4, 1998, Tadlock issued a Notice of Delay, addressing problems arising from errors, omissions and conflicts in the Contract Documents.

45. On August 4, 1998, the Government acknowledged Tadlock's Notice of Delay in writing, agreeing to attend a meeting to address the delay and suggesting that representatives of certain subcontractors be present.

46. On August 7, 1998, CMH Construction LP, the concrete subcontractor, notified Tadlock of a conflict in the plans for the concrete slab pour and requested a deviation to correct that conflict.

47. On August 8, 1998, the Government sent a notice to Tadlock, alleging insufficient asphalt patching and the need for moving a fence.

48. On August 8, 1998, Tadlock and the Government entered into another modification of the Contract, Modification of Contract No. A00003, decreasing the total Contract Price by $18,656.00 from $6,010,230.65 to $5,991,574.65 by adding $14,964.00 in modifications and subtracting $33,620.00 in deleted items. Modification of Contract No. A00003 effected the adjustments to the food service design and equipment addressed in Prime Cover No. 2 which, as the Government had acknowledged in writing on March 11, 1999, necessitated an extension of the Contract Performance Period. Nevertheless, despite the Government's admission, the Contract Performance Period remained unchanged.

49. On August 11, 1998, Tadlock responded to the Government's August 8 Notice, reporting that the Commanding Officer of Miramar drove by the job site and stated that he was satisfied with the appearance and location of the fence. In addition, Tadlock reported that it had completed all the referenced asphalt patching.

50. On August 12, 1998, subcontractor Tomen Building Components, Inc. ("TBC") submitted a memorandum to Tadlock, reporting that TBC's progress with siding and roof installation was being delayed due to indecision on the part of ROICC as to what color would be chosen. TBC reported that the delivery schedule for the entire project was impacted by this indecision.

51. On August 12, 1998, Tadlock notified the Government in writing that the Government's failure to make a decision on Prime Cover No. 28 was impacting the construction schedule.

52. On or about August 13, 1998, the ROICC issued its formal response to Field Notice No. 62, which had been issued on June 12, 1998, addressing errors, omissions and problems previously addressed in Field Notices No. 33-41. The Government's response effectively acknowledged errors in the Contract Documents concerning the electrical drawings and missing roof drain lines.

53. On August 13, 1998, the ROICC acknowledged the existence of potential conflict in the Project Documents in its response to Field Notice No. 94.

54. The ROICC took sixty-two days to respond to the identification of errors in the electrical drawings and forty-eight days to respond to the issue of the missing roof drains. These delays and response time resulted in about forty days in Tadlock's completion of the "slab-on-grade" phase of the project.

55. The ROICC's delay in response time as to problems identified in the electrical drawings and the missing roof drains also caused an additional two-day delay in completion of Prime Cover No. 27, which addressed the routing of the roof drains.

56. Tadlock also issued Field Notices Nos. 25 (dated April 23, 1998), 26 (dated April 22, 1998), 86 (dated July 13, 1998), 89 (dated July 16, 1998) and 93 (dated July 31, 1998) to address further errors and omissions in certain drawings among the Contract Documents which contributed to the above-described periods of delay.

57. On August 17, 1998, Tadlock and the Government entered into another modification of the Contract, Modification of Contract No. A00004, whereby the Contract Price was increased by $10,255.00 from $5,991,574.65 to $6,001,829.65, in exchange for modifications to storm drains, installation of an additional storm drain line, and fortifying a heavy duty traffic cover for the manhole in the driveway approach. The Contract Performance Period still remained unchanged.

58. On August 26, 1998, Tadlock and the Government entered into another modification of the Contract, Modification of Contract No. A00005, whereby the total Contract Price was increased by $3,798.00, from $6,001,829.65 to $6,005,627.65, in exchange for installation of valves and boxes in an existing eight-inch water line. The Contract Performance Period was left unchanged.

59. On August 26, 1998, Tadlock and the Government executed another modification to the Contract, Modification of Contract No. A00006, to increase the Contract Price by $119.72 from $6,005,627.65 to $6,005,747.37 to reimburse Tadlock for one-half the cost of a follow-on Partnering Workshop held on July 29, 1998. The Contract Performance Period remained unchanged.

60. On August 26, 1998, Tadlock and the Government entered into a further Modification of the Contract, Modification of Contract No. A00007, wherein the total Contract Price was increased by $4,674.00 from $6,005,747.37 to $6,010,421.37 in exchange for adding a stainless steel heat exchanger and burners. The Contract Performance Period remained unchanged.

61. On August 26, 1998, Tadlock and the Government entered into another modification of the Contract, Modification of Contract No. A00008, wherein the Contract Price was increased by $3,187.00 from $6,010,421.37 to $6,013,608.37, in exchange for tunneling under the existing ductbank which interfered with other utilities and building footings. This was the same ductbank that had been discovered in March 1998, and the nondisclosure of which the Government effectively admitted in April 1998 to be an error and omission in the Contract Documents. The Contract Performance Period, however, remained unchanged.

62. Between August 27 and September 29, 1998, Tadlock issued Field Notices Nos.100, 101 and 106 which addressed further errors and omissions in the Contract Documents. Specifically, these field notices addressed the failure of the Project designs and specifications to provide for adequate venting and exhaust of gas-fired equipment. These errors and omissions impacted Tadlock's ability to close the roof structure, because the omissions prevented the completion of the metal decking and underlying structural support. This impediment in turn prevented the placement of membrane roofing, preventing the closure of the building to the elements, and thus delaying the next phase of completing the building interior.

63. The Trustee is informed and believes that, due to the above-described causes which were not the fault of Tadlock, the Project Completion Period was delayed a total of one-hundred thirty seven days, from the commencement of the Project Completion Period through the closing of the building to the elements.

64. On September 4, 1998, Dynalectric, an electrical lighting subcontractor, informed Tadlock

in writing that its supplier, Graybar, had been damaged by the Government's indecisiveness on the type of lighting fixtures to be used and that the Government's indecisiveness caused delay in the Project schedule. Dynalectric supplied correspondence dated September 3, 1998 from Graybar and concurred with Graybar's position.

65. On September 4, 1998, Dynalectric also sent Tadlock a letter from Powereps, sent to Trielectric Supply Company, concerning errors and omissions in the Contract Documents as to electrical components and requesting multiple deviations from certain electrical specifications in the Contract Documents.

66. On September 11, 1998, Tadlock submitted Prime Cover No. 9 to ROICC, addressing the necessity to add control joints to the masonry walls and addressing the delay and added cost resulting therefrom.

67. On September 11, 1998, Tadlock was required to issue Field Notice No. 104; and on September 25, 1998, Field Notice 105. Field Notices 104 and 105 addressed further errors and insufficient details which further contributed to the delay of over thirty-two days in the completion of Masonry.

68. On September 21, 1998, the Government and Tadlock finally entered into a modification to the Contract, Modification of Contract No. A00009, to increase the Contract Price by $34,387.00 from $6,013,608.37 to $6,047,995.37 to reimburse Tadlock for trackhoe costs to remove the additional cementous material that had not been indicated on the boring logs included with the Project plans and specifications. This was the same cementous material discovered in March 1998. The Contract Performance Period remained unchanged.

69. On September 29, 1998, Tadlock and the Government entered into a further modification of the Contract, Modification of Contract No. A00010, wherein the total Contract Price was increased by $7,023.00 from $6,047,995.37 to $6,055,018.37, in exchange for rerouting a ductbank, expanding

asphalt demolition, adding a duplex outlet and wiring for the receiving scale, and changing wiring and circuit breakers for the refrigeration system. The Contract Performance Period remained unchanged.

70. Between October 5, 1998 and March 3, 1999, Tadlock issued Field Notices Nos. 108, 134, 140, 152, and 161, and Prime Cover No. 52 and Modification of Contract No. 23, which addressed errors, omissions and discrepancies in the metal studs and the drywall design for the Project. The Trustee is informed and believes that these design errors, along with poor coordination between the food service drawings and the electrical drawings, delayed the Project Completion Time another twenty-one days, to a total of one-hundred fifty eight days of delay.

71. On or about October 8, 1998, additional cementous materials were found under the roadways. This impediment slowed excavation by requiring the use of heavier equipment, and interfered with the new tie ends of the re-routed site utilities.

72. On October 15, 1998, Tadlock and the Government entered into Modification of Contract No. A00011 wherein the total Contract Price was increased by $83,143.00, from $6,055,018.37 to $6,138,161.37, in exchange for additional conduit, wiring boxes, and lobby light revisions, excavation and removal of hard pan, dirt and utilities, and placing slurry into the footings. The Contract Performance Period remained unchanged.

73. On October 15, 1998, Tadlock and the Government entered into Modification of Contract No. A00012, whereby the total Contract Price was increased by $25,170.00, from $6,138,161.37 to $6,163,331.37 in exchange for adding forty-eight strands of fiber cable and crediting Tadlock for four hundred pairs of telephone cable. The Contract Performance Period remained unchanged.

74. On October 15, 1998, Tadlock and the Government entered into Modification of Contract No. A00013 wherein the total Contract Price was increased by $19,858.00 from $6,163,331.37 to $6,183,189.37 in exchange for adding control joints into the Concrete Masonry Units ("CMU") that

were manufactured on-site to form the walls of the building. The Contract Performance Period remained unchanged.

75. On October 20, 1998, Tadlock requested a substitution of the storefront hardware for the purposes of cost savings to the Government, reliability, ease of maintenance, and compatibility with the storefront. The revision was anticipated to result in a credit of about $4,400.00 to the Government.

76. On October 20, 1998, Tadlock submitted additional questions relating to Field Notices Nos. 100 and 101, addressing additional information, specifications and specific details that had been omitted from the Contract Documents.

77. On October 26, 1998, Tadlock submitted further duct support detail drawings for the ROICC to review and approve, outlining various advantages over the details set forth in the Contract Documents.

78. On November 4, 1998, Tadlock and the Government entered into Modification of Contract No. A00014, wherein the total Contract Price was increased by $6,091.00 from $6,183,189.37 to $6,189,280.37 in exchange for repairing the eight-inch water line and encasing the shallow utility lines in concrete. The Contract Performance Period remained unchanged.

79. On November 6, 1998, Tadlock notified the Government that the Government's indecision in selecting colors for doors, windows, hardware, and the colored concrete patio slab was likely to cause further delay in completion of the Project.

80. On November 6, 1998, Tadlock notified the ROICC of twelve field notices, dated between June 1, 1998 and October 26, 1998, to which Tadlock had not received responses from the Government.

81. Between November 9, 1998 and February 19, 1999, Tadlock issued Field Notices Nos. 113, 122, 123, 124, 125, 126, 127, 128, 153 and 160, and Prime Cover No. 57, which necessitated

Modification to Contract No. A00018, addressing the additional work required due to the issues addressed in these ten field notices.

82. The ROICC took from thirteen to twenty-six days to respond to each of these field notices. The Trustee is informed and believes that this excessive time contributed to fifty (50) further days of delay on the Project.

83. On November 10, 1998, Tadlock notified the Government of specific issues addressed in field notices regarding roofing and monocoating, to which the Government had delayed in responding, causing delay in completion of the roofing and monocoating.

84. On November 10, 1998, the Government finally notified Tadlock verbally of the color chosen for the store front frames, windows and doors, but required Tadlock to submit a written proposal.

85. In early October 1998, Tadlock discovered that the store front window wall system, as designed in the Contract Documents, was attached to two design columns in such a way that no block manufacturer could produce a block that would work for the design as drawn. Tadlock notified the Government's architect of this discrepancy on October 6, 1998. Not having received any direction from the Government's architect, on November 11, 1998 Tadlock submitted Field Notice No. 118 to the Government, addressing the problem and requesting a response by November 16, 1998.

86. To respond to this error in the design of the store front window wall system, the glazing subcontractor offered a solution, which Tadlock agreed to in the interest of avoiding further delay but which added $9,335.00 to the glazing subcontractor's charge to Tadlock. The ROICC never submitted an official response to Tadlock on this added charge, and the Trustee does not believe that the Government ever reimbursed Tadlock for this extra charge.

87. On November 12, 1998, the Government notified Tadlock that it would not reimburse Tadlock for removal of dirt and concrete, as requested, and that it would not pay for installation of

a security fence, despite the fact that the security fence was specified in the Contract Documents, because Tadlock allegedly failed to request the reimbursement strictly in accord with the Government's guidelines.

88. Later in November 1998, disputes and disagreement arose among the electrical contractor, the food service equipment contractor, the fire system contractor, the plumbing contractor, and the refrigeration contractor as to which subcontractor would perform and complete what tasks outlined in the Contract Documents. These disputes arose from errors, omissions and discrepancies in the Contract Documents. Tadlock was required to schedule meetings with and among these various contractors to resolve the disputes and disagreements. Tadlock was also required to produce and submit a number of Field Notices addressing the errors, omissions and discrepancies in the Contract Documents that give rise to these disputes and disagreements. These efforts on Tadlock's part contributed significantly to delay in completion of the Project.

89. On November 23, 1998, the Government wrote to Tadlock expressing concern that Mechanical/Electrical/Plumbing ("MEP") Coordination Drawings had not yet been prepared. A meeting was held between Tadlock and the Government to address this issue.

90. On December 1, 1998, Tadlock responded that the MEP Drawings needed to be as-built "shop drawings" created during work, and that it was impractical and not feasible to prepare such drawings before commencing work. Tadlock recommended that the changed conditions and the errors and omissions in the Contract Drawings be addressed as they were encountered, making it more appropriate for the MEP Drawings to be prepared as ongoing as-built shop drawings, while the work progressed. The issue of the MEP Drawings was tentatively resolved per Tadlock's recommendations in a meeting between Tadlock and the Government on December 2, 1998.

91. On December 1, 1998, Tadlock wrote a memo to the Government identifying an unforeseen condition encountered in bolting the loading dock canopy to the surface of the building.

92. On December 2, 1998, Tadlock faxed a memorandum to the Government itemizing additional issues needing written direction from the Government, which prevented the drywall subcontractor from beginning framing for the Project while unresolved.

93. On December 8, 1998, Tadlock, the Government, and representatives of subcontractors attended a Progress Partnering Session which addressed the unresolved prime cover orders, scheduling issues, time and impact costs, and Tadlock's reservation of its rights to recover time extension and impact costs resulting from the changed work.

94. At the Progress Partnering Session, it was recognized that the issue of Tadlock's right to recover time extension and impact costs was a very significant source of uncertainty and potential controversy. Tadlock agreed to prepare an overall analysis of time extensions considered warranted and the resulting time related impact costs, and to submit that analysis to the Government no later than February 1, 1999. The parties agreed to negotiate the matter in good faith by March 1, 1999.

95. On December 9, 1998, Tadlock and the Government entered into Modification of Contract No. A00015, wherein the total Contract Price was increased by $7,244.00, from $6,189,280.37 to $6,196,524.37 in exchange for Tadlock's removal of spoils left on the contractor's laydown site area by other parties. The Contract Performance Period remained unchanged.

96. On December 16, 1998, Tadlock issued Prime Cover No. 34, which was eventually incorporated into Modification of Contract No. A00019, itemizing errors in the electrical drawings within the Contract Documents. The Trustee is informed and believes that the dispute among food service and electrical subcontractors caused by these errors and discrepancies in the food service drawings and specifications contributed in part to an additional one-hundred and twenty days taken to resolve those errors.

97. On December 29, 1998, Tadlock and the Government entered into Modification of Contract No. A00016, wherein the Contract Price was increased by $734.36 from $6,196,524.37 to

$6,197,258.73, to reimburse Tadlock for one-half the cost of a further follow-on to the Progress Partnering Session held on December 8, 1998. The Contract Performance Period remained unchanged.

98. On January 11, 1999, Tadlock issued Field Notice No. 141, reporting that certain louvers shown in the drawings among the Contract Documents had duct work missing. Tadlock informed the ROICC of this omission but proceeded to provide and instal galvanized duct work prior to negotiation of a modification to the Contract, to minimize further delay to the Project Completion Period.

99. The ROICC took thirty days to respond to Tadlock's report on the missing duct work. Ultimately on February 17, 1999 the ROICC responded, requiring the installation of galvanized ductwork. However, the ROICC failed to acknowledge the actual cost of the galvanized duct work and installation and issued a unilateral response for less than the cost to Tadlock.

100. On January 13, 1999, Tadlock issued Field Notice No. 143 addressing window issues, specifically that the window items drawn would not fit into the spaces shown. The Government accepted Tadlock's recommendations and, in its response dated January 20, 1999, endorsed a contract modification at cost. However, the Government never entered into such a modification and effectively caused Tadlock to perform the required re-work at no additional cost.

101. Prior to February 5, 1999, the Government requested that Tadlock perform a self-evaluation of the status of the Project, to be considered by the Government in issuing its Interim Performance Evaluation upon 65% completion of the Project. Tadlock returned that self-evaluation on or about February 5, 1999, identifying "Adherence to Approved Schedule" as the one "Unsatisfactory" element, due to unforseen conditions, delays with response to Field Notices, and delays with issuing change orders which were identified as causes for this unsatisfactory element.

102. On February 22, 1999, the Government issued its Interim Performance Evaluation,

evaluating four areas of scheduling and delay resolution as "Unsatisfactory" but not acknowledging the Government's role in causing these delays. The Government issued an overall performance evaluation of "Satisfactory" for Tadlock's performance on the Project.

103. On February 10, 1999, Tadlock issued Field Notice No. 157, which corresponded to Prime Cover No. 63 and Modification to Contract No. A00025 forwarding a transmittal from Tadlock's electrical subcontractor Dynalectric identifying discrepancies in the Contract Documents regarding inverter loads. The Government responded on February 18, 1999, transmitting sketches with revisions to correct the discrepancies that were addressed.

104. On March 18, 1999, Tadlock submitted Field Notices Nos. 165 and 165r, which corresponded to Prime Cover No. 66 and Modification to Contract No. A00025, addressing the lack of indication of circuitry for kitchen heat lamps. Tadlock requested an expedited immediate response because the electrical subcontractor was already installing the utilities in the cabinet bases. The Government responded nearly a week later with a revised answer providing a source for the circuitry.

105. On April 28, 1999, Tadlock submitted Field Notice No. 180 which corresponded to Prime Cover No. 74 and Modification to Contract No. A00028 addressing discrepancies in the Contract Documents for the circuitry serving the bake oven in the kitchen. The Government responded on May 11, 1999 with an endorsement for circuitry revisions providing additional circuitry to rectify the issue.

106. On or about May 4, 1999, Tadlock submitted Field Notices Nos. 181 and 183, which corresponded to Prime Cover No. 73 and Modification to Contract No. A00029 addressing further discrepancies and contradictions in the Contract Documents including the provision of 208 volt service for 110 volt food service units and undersized wire servicing heat lamps. The Government responded with instructions to install the appropriate service.

107. On May 21, 1999, Tadlock submitted Field Notice No. 187, which corresponded to Prime Cover No. 81 and Modification to Contract No. A00029 addressing concerns voiced by Tadlock's electrical subcontractor Dynalectric concerning discrepancies in the Contract Documents creating problems with the lighting control sequence of operation. The Government responded on June 4, 1999, two weeks later, with an endorsement for modification but no explicit instructions, presumably concurring with Dynalectric's suggested solution for the problems.

108. On May 26, 1999, Tadlock submitted Field Notice No. 189, which corresponded to Prime Cover No. 82, which again addressed concerns voiced by Dynalectric involving problematic discrepancies set forth by the Contract Documents in the electrical circuitry planning. The Government responded on June 4, 1999 with agreement to the resolution suggested by the subcontractor.

109. On June 10 and June 13, 1999, Tadlock served Field Notices No. 196 and 198, which correspond to Prime Cover No. 86, which yet again addressed concerns voiced by Dylanectric about discrepancies in circuitry set forth in the Contract Documents, including the circuitry for the fire suppression panels. The Government responded on June 24, 1999 to Field Notice No. 198 with an endorsement fo the subcontractor's suggested resolution but is not indicated to have responded concerning the fire suppression panels. These field notices, prime covers and modifications note and address numerous errors, omissions, conflicts and deficiencies in the electrical drawings included among the Contract Documents. To mitigate further delay, Tadlock performed the corrective work that was required to remedy these problems prior to negotiation with Government.

110. Ultimately in its response, the ROICC failed to acknowledge the actual costs for the above-mentioned field notices, prime covers and modifications to the Contract, and issued a unilateral modification for less than Tadlock's cost.

111. On February 11, 1999, the ROICC determined that a series of negotiations begun on

January 19, 1999 had failed to reach agreement on an equitable adjustment for various changes required for plumbing in the building, and a credit for floor closers that were changed to concealed overhead closers. As a result, the Government unilaterally issued and executed Modification of Contract No. A00018 on March 9, 1999, to increase the total contract price by $10,823.00 from $6,212,258.73 to $6,223,081.73. The Contract Performance Period was to remain unchanged. Tadlock appears never to have signed Modification of Contract No. A00018.

112. On or about February 17, 1999, Modification of Contract No. A00017 was drafted to increase the total Contract Price by $15,000.00, from $6,197,258.73 to $6,212,258.73 to reimburse payment for additional import of soils by a subcontractor, Cutting Edge, to achieve the necessary building pad elevations. The Contract Performance Period was to remain unchanged. It appears that neither Tadlock nor the Government signed Modification of Contract No. A00017.

113. On or about February 19, 1999, Tadlock submitted Prime Cover No. 65, a request for "Impact Delay Costs" in the amount of $320,202.00 and a 114-calendar-day extension of the Project Completion Period. These costs included costs for three major subcontractors, DYNA Electric, Davis Mechanical, and CMH Concrete. Tadlock also requested payment for extended overhead at the rate of $2,796.00 per day. The Government responded on April 20, 1999, with a request for clarification of four issues that did not concern the causes for the delay.

114. On February 23, 1999, Tadlock notified the Government that Prime Covers Nos. 27, 37, 50, 21, 25, 47, and 52 totaling $59,455.00 had been negotiated, and the work had been completed for several months. However, the Government had failed to issue modifications of contract to cover this work and Tadlock had not been paid.

115. On March 3, 1999, Tadlock again notified the Government that Prime Covers Nos. 21, 25, 26, 27, 34, 37, 41, 47, 49, 50, 52, and 56, totaling $99,371.00 had been negotiated, but no modifications to contract had been issued despite the fact that the work had been completed for

several months. Tadlock had not been paid for any of this work.

116. On March 3, 1999, Tadlock also again notified the Government that Prime Covers Nos. 20, 23, 42, 43, 44 and 45 giving the Government $37,991.00 in credits had been negotiated but modifications had not been issued.

117. On March 3, 1999, Tadlock also notified the Government that Prime Covers Nos. 39, 40, 48, 51, 65 and 69, plus a prime cover for Field Notice No. 142, totaling $361,577.00, had yet to be negotiated.

118. On March 4, 1999, the Government acknowledged that Prime Covers Nos. 39, 40, 48, 52, 64 and 65 had been received, but that Field Notice No. 142 had not yet been determined to be a prime cover.

119. On March 5, 1999, Tadlock notified the Government that Prime Covers Nos. 34 and 57 needed to be negotiated expeditiously and requested a March 11, 1999 meeting to finalize those negotiations.

120. On March 12, 1999, Tadlock notified the Government again that the prime covers noticed on March 3, 1999 were still outstanding and that the Government had stated on two occasions that it would issue a unilateral prime cover for the food service electrical and plumbing connections. Although Tadlock had been waiting for over four weeks for a response, Tadlock had received no direction from the Government. Tadlock emphasized that the Government's immediate attention was necessary to avoid additional delay.

121. On March 16, 1999, Tadlock notified the Government that on March 15, 1999, it had received Modification of Contract No. A00018, dated March 9, 1999, which did not provide direction and only addressed a dollar amount that was no longer valid. Tadlock requested expedited provision of written directions and a prime cover to cover all of the additional work that was required.

122. On or about March 19, 1999, Tadlock issued Field Notice No. 167, which showed that food service equipment for the Project was improperly designed to butt against a split face CMU.

123. On March 22, 1999, Tadlock notified the Government that no direction had been received on Prime Cover No. 56, regarding canopy changes, and requested the Government's immediate attention.

124. On March 22, 1999, the Government claimed in writing that outstanding prime covers from 1998, specifically Prime Covers Nos. 17, 45, 58 and 59, would provide an offset for the cost for Prime Cover No. 56 that was negotiated on February 24, 1999. Tadlock responded on March 4, 1999 rebutting some of the contentions.

125. On or about March 23, 1999, the ROICC responded to Field Notice No. 167 and admitted that a design error existed in the Contract Documents. However, the ROICC took over fifty days to issue a modification of the Contract to mitigate the impact of that design error.

126. On April 7, 1999, Tadlock notified the Government that Prime Covers Nos. 36 and 68 needed to be negotiated immediately to avoid delaying the food service equipment subcontractor from installing equipment in the dining area and the asphalt contractor regarding asphalt work.

127. On April 9, 1999, Tadlock and the Government entered into Modification of Contract No. A00019, wherein the total Contract Price was decreased by $78.73, from $6,223,081.73 to $6,223,003.00, in exchange for various additional plumbing, electrical and excavation items, and crediting various changes to plumbing, flooring, store front, and lockers. The Contract Performance Period remained unchanged.

128. On April 12, 1999, Tadlock notified the Government that Prime Covers Nos. 17, 36, 39, 40, 48, 51, 60, 62, 63, 64, 65, 66, and 68, as well as Field Notice No. 138, totaling $383,03.00, still remained outstanding and requested a date for negotiation of these prime covers.

129. On April 16, 1999, Tadlock and the Government entered into Modification of Contract

No. A00020, wherein the total Contract Price was increased by $12,002.00, from $6,223,003.00 to $6,235,005.00 in exchange for Tadlock's rerouting the roof drains. The Contract Performance Period remained unchanged.

130. On April 16, 1999, Tadlock and the Government entered into Modification of Contract No. A00021, wherein the total Contract Price was increased by $2,162.00 from $6,235,005.00 to $6,237,167.00 in exchange for adding color to the patio slab and installing color sealer on the patio concrete. The Contract Performance Period remained unchanged.

131. On April 16, 1999, Tadlock and the Government entered into Modification of Contract No. A00022, wherein the total Contract Price was increased by $15,378.00 from $6,237,167.00 to $6,252,545.00 to reimburse rental of a generator to supply temporary power to the field office, the removal of the 12kV ductbank by Cutting Edge, and installation of precast on top of the Concrete Masonry Unit walls. This 12kV ductbank was the same ductbank that the ROICC asked Tadlock to tunnel under during April 1998. The Contract Performance Period was extended only one calendar day, to March 23, 1999, despite the complexity of these changes.

132. On April 16, 1999, Tadlock and the Government entered into Modification of Contract No. A00023, wherein the total Contract Price was increased by $49,638.00 from $6,252,545.00 to $6,302,183.00 in exchange for adding a floor drain, structural steel changes due to incomplete drawings, adding patina coloring to the SST canopy roofing at the loading dock, and additional work associated with drywall demolition and replacement due to ceiling rework for reinstallation of additional piping. The Contract Performance Period remained unchanged.

133. On April 26, 1999, Tadlock notified the Government that Prime Covers Nos. 17, 36, 39, 40, 60, 62, 64, 66, 68, and 69, as well as Field Notice No. 164, totaling $49,520.00 needed to be negotiated immediately to avoid any further delays. Although asphalt was scheduled to be poured on Monday, May 3, 1999, Prime Covers Nos. 36, 17, and 69 would need to be negotiated to avoid

delay in pouring the asphalt.

134. On April 27, 1999, the Government notified Tadlock that the Government would not pay further costs for the work outlined in Field Notice No. 77, which was negotiated as Prime Cover No. 34, and expected Tadlock to cover that cost under the Contract.

135. On or about April 28, 1999, Lieutenant Stephen Revelas of the ROICC replied to Prime Cover No. 65, issued on February 19, 1999, with a letter claiming that four activities had been changed on the Project, thus extending the time for completion of the Project 70 calendar days.

136. On May 10, 1999, Tadlock executed Modification of Contract No. A00024, proposing to increase the total Contract Price by $3,136.00, from $6,302,183.00 to $6,305,319.00, in exchange for drilling expenses. It appears that the Government did not execute Modification of Contract No. A00024.

137. On May 20, 1999, Tadlock executed Modification of Contract No. A00025, proposing to increase the total Contract Price by $19,095.00, from $6,305,319.00 to $6,324,414.00 for various heating, ventilation, wiring and plumbing changes. It appears that the Government never executed Modification of Contract No. A00025.

138. By May 20, 1999, twenty-five Modifications to the Contract had been issued. These modifications resulted from nearly two hundred Field Notices, most of which identified errors and omissions in the drawings and in the plans and specifications among the Contract Documents, and from at least sixty-eight Prime Cover requests issued by Tadlock for these modifications.

139. On May 20, 1999, the Government alleged in writing that Tadlock had not kept current the MEP Coordination Drawings according to the Contract and demanded immediate discussion of Tadlock's intent to properly update the MEP Coordination Drawings.

140. On May 26, 1999, Tadlock replied, pointing out that the MEP Coordination Drawings were submitted to the ROICC on December 17, 1998, as Submittal Number 75. As of May 26, 1999,

these drawings had not been reviewed or returned by the ROICC and Tadlock was told by the ROICC that they would not be reviewed and returned. Tadlock also denied that it was not in compliance with maintaining as-built drawings, and pointed out that Lieutenant Revelas had reviewed the as-built drawings on numerous occasions at weekly quality control meetings. Tadlock offered to provide the Government with two complete sets of as-built drawings for the Government's use.

141. On May 26, 1999, the Government began moving its furniture into the building, thus constructively accepting completion of the Project.

142. On or about June 1, 1999, Lieutenant Revelas of the ROICC wrote Tadlock a letter addressing further analysis of the Impact Delay Costs requested in Prime Cover No. 65 in which Lt. Revelas acknowledged that the current delays were caused by unforeseen conditions and design deficiencies. In this letter, Lt. Revelas officially relieved Tadlock of liquidated damages through April 20, 1999, thus extending the Project Completion Period to that date. However, Lt. Revelas failed to issue a corresponding "Standard Form 30 Contract Modification."

143. On June 7, 1999, Tadlock offered to order two bicycle racks at no extra cost to the Government.

144. On June 10, 1999, Tadlock again requested a meeting with the Government to review and discuss the Impact Delay Costs itemized in Prime Cover No. 65, as soon as possible. The meeting was scheduled for June 16, 1999.

145. On June 11, 1999, Tadlock notified the Government that fire extinguishers needed to be supplied prior to the final fire inspection scheduled for June 17, 1999. Tadlock had already requested instructions as to the fire extinguishers' locations in Field Notice No. 140 on January 8, 1999, and was told that the fire department would provide fire extinguishers for installation by the contractor but at no extra cost. The architectural drawings did not set forth any locations for the fire

extinguishers.

146. On June 15, 1999, Tadlock requested discussion to resolve a disagreement as to the extent and methodology for asphalt density testing. The asphalt density testing could not proceed forward without resolution of this issue.

147. Also on June 16, 1999, Tadlock and the Government had a disagreement of whether further modifications to contract, to resolve several outstanding prime covers, could be processed without the Government being given certain credits that it demanded. The Government admitted that it was required to issue written field notices regarding credits but threatened to "bury" Tadlock in paperwork and make future negotiations very difficult for Tadlock, should Tadlock insist on the written field notices.

148. On or about June 16, 1999, after two negotiating sessions, Tadlock and the Government agreed to an assessment that fifty-one days of delay had occurred in the Project Completion Period through no fault of Tadlock, up through the Masonry phase of the project.

149. On June 16, 1999, the Government issued Modification of Contract No. A00027, purporting to decrease the total Contract Price by $620.00, the difference between the added costs of $2,747.00 for changes to the Project and $800.00 for sanitary cleaning of the floor areas, and $4,167.00 in deletions. The Government had directed Tadlock's cleaning subcontractor to perform additional work beyond the scope of the subcontract but deleted the $4,167.00 premised upon the Government's claim that Tadlock had not properly protected the file floor. Based upon photographic proof that Tadlock had protected the floors in excess of contract requirements, Tadlock disputed the Government's proposed Modification in writing on June 18, 1999 and did not sign Modification of Contract No. A00027.

150. On or about June 20, 1999, Tadlock by letter requested a time extension for the Project Completion Period from March 23, 1999 to July 14, 1999 to facilitate the making of Contract

payments without assessment of liquidated damages, and again requested that Tadlock and the Government resume negotiations. Previous negotiations had been suspended by the Government.

151. On June 30, 1999, Tadlock memorialized the dispute between Tadlock and the Government, where the Government had threatened to assess liquidated damages for delay, while Tadlock reiterated its February 19, 1999 request for impact delay costs and a 114 calendar-day extension of the Contract Completion Period, without assessment of liquidated damages. Tadlock once again requested negotiations for resolving the issues surrounding the Impact Delay Costs.

152. On July 1, 1999, the Government withheld $17,504.00 from payment of Tadlock's Invoice No. 12, due to purported failure to deliver as-built plans, operations and maintenance manuals and other items. Tadlock protested that retention and disputed the Government's allegations.

153. On July 7, 1999, Tadlock and the Government entered into Modification of Contract No. A00026, whereby the total Contract Price was increased by $5,953.00, from $6,324,414.00 to $6,330,367.00, in exchange for Tadlock's adding 120 volt power to the fire suppression panels. The Contract Performance Period remained unchanged. The issue of power to the fire suppression panels had previously been addressed in Field Notice No. 196, to which the Government had not formally responded.

154. On July 8, 1999, Tadlock rescinded all prime covers which had not resulted in a contract modification and reserved its right to seek additional compensation and time for these items. These included Prime Covers Nos. 17, 36, 45, 61, 62, 71, 72, 73, 75, 76, 80, 81, 82, 83, 84, 85 and 86.

155. On July 8, 1999, the Government by letter formally initiated its warranty period, which constituted a formal acceptance of the building. No formal notice of completion or acceptance was ever given.

156. On July 15, 1999, the Government again notified Tadlock in writing that it had

commenced the possession of the work completed under the Contract, thus commencing the one-year warranty period for the Project on July 8, 1999.

157. On or about July 19, 1999, CMH Construction L.P., a subcontractor on the Project, sued Reliance Insurance Company who had bonded Tadlock's performance of the Project. Reliance tendered the defense of that lawsuit to Tadlock on July 19, 1999. On October 1, 1999, Reliance again tendered defense and indemnity to Tadlock.

158. On or about July 20, 1999, Modification of Contract No. A00029 was proposed to decrease the total Contract Price by $5,107.00, from $6,331,121.00 to $6,326,014.00 due to various adjustments for pavement, electrical service, and roof drains. The Contract Performance Period was to remain unchanged. It appears that neither Tadlock, nor the Government executed Modification of Contract No. A00029.

159. Because the Project Completion Date officially remained March 23, 1999, the Project was deemed by the Government to have overrun the Contract Performance Period by 114 days.

160. On or about August 10, 1999, Tadlock prepared and submitted to the Government a change order proposal that included a schedule showing all of the penetrations called for in the Contract Documents.

161. Upon receipt of this prepared change order proposal, Lt. Revelas directed that the additional work be performed prior to the issuance of a contract modification, assuring Tadlock that a modification would be issued when the funds were available.

162. Lt. Revelas' commanding officer, Lieutenant Commander Angell, proceeded to issue a calculation of liquidated damages to be assessed against Tadlock using the seventy-two day calculation he previously derived, and resulting in thirty-one days over the contract period. This final figure almost exactly equaled the amount of funds remaining in the contract period.

163. Without offering compensation to Tadlock for delays caused by the Government, to

which Lt. Commander Angell had previously admitted, the ROICC made an offer to extend the Contract Completion Date to the actual completion date, thus dropping the Government's claim for liquidated damages against Tadlock and releasing the remaining contract funds, but on the condition that Tadlock drop any claims Tadlock might have against the Government concerning the Project.

164. On August 17, 1999, the Government executed Modification of Contract No. A00029 to decrease the total Contract Price by $68.00 from $6,331,121.00 to $6,331,053.00 as the result of numerous adjustments to paving, a vapor retarder, duct work, plumbing and electrical service. The parties were unable to negotiate this adjustment successfully and Tadlock did not sign Modification No. A00029. The Government thereafter unilaterally initiated Modification of Contract No. A00029. The Contract Performance Period remained unchanged.

165. On August 19, 1999, Tadlock and the Government executed Modification of Contract No. A00028, whereby the total Contract Price was increased by $1,374.00 from $6,329,747.00 to $6,331,121.00 in exchange for Tadlock providing three-phase power to the baking oven. The Contract Performance Period remained unchanged.

166. On or about October 25, 1999, Tadlock met with ROICC personnel and presented an as-built schedule for the Project, which indicated that the Government was responsible for a minimum of 160 working days of delay for completion of the Project. Tadlock also showed that there were an additional sixty-five working days of delay that could possibly be attributable to Tadlock's activity, but that could also be attributable to impact caused by the Government, and the "ripple effect" to Tadlock's subcontractors' progression with the Project.

167. At this point, the Government was still withholding $112,000.00 in funds under the Contract without offering any explanation for that withholding.

168. On November 29, 1999, Tadlock and the Government executed Modification of Contract No. A00030 to acknowledge the provision of galvanized duct work as issued unilaterally by the

Government in Modification of Contract No. A00029. The Contract Performance Period remained unchanged and the total Contract Price remained $6,331,053.00.

169. On January 6, 2000, Tadlock and the Government executed Modification of Contract No. A00031, whereby the total Contract Price was decreased by $403.00 from $6,331,053.00 to $6,330,650.00, to credit plumbing equipment and to replace thresholds at the loading dock. The Contract Performance Period remained unchanged.

170. Tadlock commissioned a study of the Project, which was issued on January 10, 2000. In that study, the actual duration for phases of the Project were compared to derive the gross contribution of each controlling activity to the total project delay, thus determining the causes of the contract time overrun. The responsibility for the delay to each controlling activity was then determined. The study concluded that a total of 181 working days delay was the responsibility of the Government, while a total delay responsibility of 65 working days was allotted to Tadlock. Offsetting the Government delay by Tadlock's delay, the study concluded that a net delay of 116 working days was attributable to the Government's administration of the Project.

171. On January 18, 2000, Tadlock notified the Government that the four remaining punch list items for the Project had been addressed.

172. On February 1, 2000, Tadlock through its attorney issued a request for time extension and for release of retention, itemizing some three hundred separate instances of plan errors and omissions in the Contract Documents and differing site conditions, all of which delayed the final completion date of the project from the original completion date of March 22, 1999 until July 8, 1999, the date the Government started the warranty. No formal notice of completion or acceptance was ever given.

173. On February 9, 2000, the Government wrote to Tadlock acknowledging that all outstanding punch list items based on the walk-through of the enlisted dining facility on January 13, 2000, had been completed with the exception of No. 10, an "east facing door."

174. On February 10, 2000, Tadlock responded, stating that its subcontractor Moonlight Glass had corrected the door issue on January 20, 2000, and that the punch list was completed.

175. On January 20, 2000, Moonlight Glass had determined that the problem resulted from excessive abuse or force, since Government employees had had unlimited access to the facility for several months to move in furnishings. Moonlight determined that the work was not a repair under warranty, charging Tadlock $168.00.

176. On February 17, 2000, the Government refused to pay that cost and declared that the damage to the door was an item to be repaired under the building punch list.

177. On February 18, 2000, the Government and Tadlock agreed that all punch list items were now complete.

178. On or about February 29, 2000, the ROICC responded to Tadlock's attorney acknowledging seventy-two days of delay but admitting only thirty-two days to be the sole responsibility of the Government, and offering compensation at $1,000.00 a day, only a fraction of the actual daily costs to Tadlock and not considering payment to the subcontractors. The ROICC also claimed that certain work had not been performed and issued deductive modifications to the contract.

179. On March 14, 2000, Tadlock and the Government executed Modification of Contract No. A00032 which provided administrative provisions that were inadvertently omitted from the original specifications. The Contract Price and the Contract Performance Period remained unchanged.

180. On July 20, 2000, the Government finally responded to Tadlock's revised proposal for Prime Cover No. 65, for delay and overhead expenses. The Government demanded that Tadlock provide highly detailed responses to sixteen questions and requests for information, in only seven days.

181. On March 23, 2001, Tadlock issued to the Government Tadlock's own summary of

delays, which attributed the total delay of 158 days to the following causes: Site Utilities, 36 days; Site Grading, 7 days; Foundation, 39 days; Masonry, 37 days; and Food Service Equipment, 39 days. Tadlock attributed these delays to the discovery of undisclosed cementous material and concrete structures, changes and modifications requested by the Government, and errors and omissions in the Contract Documents.

182. On May 2, 2001, the Government executed Modification of Contract No. A00033 unilaterally reducing the Contract Price by the amount of $109,376.00, from $6,330,650.00 to $6,221,274.00 as assessment for purported liquidated damages for 106 calendar days that the Government claimed to have transpired between the contract completion date and the beneficial occupancy acceptance date. Modification No. A00033 also alleged that the contract completion date remained March 23, 1999, thus failing to acknowledge and reneging upon the Government's previous concessions of responsibility for delays and completion of the Project. Tadlock did not sign Modification of Contract No. A00033.

183. The Trustee disputes the validity of Modification of Contract No. A00033.

184. On May 7, 2001, the Government executed Modification of Contract No. A00034, reducing the contract price by $8,598.00 from $6,221,274.00 to $6,212,676.00, alleging that Tadlock failed to perform certain work and deleting certain specifications. Tadlock never signed Modification of Contract No. A00034.

185. The Trustee disputes the validity of Modification of Contract No. A00034.

186. On July 31, 2001, Tadlock filed a petition for bankruptcy under Chapter 11.

187. On January 26, 2002, the Government served upon Tadlock a demand for $392,200.00 for payment of liquidated damages not assessed to date, for the time period from March 24, 1999 to July 8, 1999, totaling 106 calendar days at the contractually established rate of $3,700 per day. That demand failed to acknowledge the Government's prior admissions of responsibility for delay.

188. On February 27, 2002, Tadlock through its counsel rebutted the Government's demand for payment of liquidated damages, pointing out the ongoing contradictions and inconsistencies in the Government's position. In correspondence dated February 29, 2000, August 2, 2000, and April 25, 2001, the Government had taken three entirely different and contradictory positions as to responsibility for delay.

189. On or about March 6, 2002, Tadlock revised its calculation of Impact Delay Costs, which were originally set forth in its February 19, 1999 Prime Cover No. 65, to reflect a total of $1,272,712.14 in total costs due, including those costs for outstanding prime covers and modifications, and 24 months' interest on billed but unpaid amounts from August 1999.

190. On March 13, 2002, Tadlock's bankruptcy petition was converted to a Chapter 7 proceeding and plaintiff Leslie T. Gladstone was appointed Trustee of the William G. Tadlock, Inc. Bankruptcy Estate.

191. Tadlock's Claim therefore became an asset of the William G. Tadlock, Inc. Bankruptcy Estate.

192. The Trustee and the Government continued negotiating Tadlock's Claim, without success.

193. Ultimately, the Trustee prepared a Final Claim Computation for $888,701.66, including interest through March 2003, which it served upon the Government on March 31, 2003 as a Certified Claim.

194. Accompanying service of the Trustee's Final Claim Computation dated March 31, 2003, the Trustee served upon the Government a formal Request for Contracting Officer's Final Decision concerning the Trustee's Certified Claim in accordance with the Disputes Clause of the Contract and the Contract Disputes Act of 1978 as amended.

195. On July 18, 2003, counsel for the Trustee resubmitted a Request for a Contracting

Officer's Final Decision concerning the Trustee's Certified Claim, again in accordance with the Dispute Clause of the Contract and the Contract Dispute Act of 1978 as amended.

**FIRST CLAIM FOR RELIEF:**

**BREACH OF CONTRACT**

196. The Government's failure to respond to the Request for Contracting Officer's Final Decision within sixty days of service of that Request deems the Request denied and thus effectively exhausts the administrative remedies available to the Trustee, enabling the Trustee to bring this action.

197. The Contract as amended constituted a written contract, whereby the Government was obligated to pay Tadlock, and is now obligated to pay the Trustee, the Contract Price in exchange for Tadlock completing the construction of the new Enlisted Dining Facility at Miramar Marine Corps Air Station, San Diego California, California, pursuant to the Contract Documents issued for the Project and to the various modifications enumerated in Modifications No. A00001 through A00033, as described above.

198. The Government failed to pay Tadlock the full amount due under the Contract, thus causing Tadlock and now the Trustee to incur damages in the amount of $888,701.66, with additional interest calculated to the time of judgment.

199. Failure to pay Tadlock the full amount of the Contract Price constituted a breach of the Contract by the Government.

200. Tadlock fulfilled all its obligations under the Contract as amended, and complied with all conditions and agreements it was required to perform under the Contract, as amended, except those obligations, conditions and agreements from which Tadlock was excused by reason of the Government's breach of the Contract, if any.

201. As a direct result of the Government's breach of the Contract through its failure to pay

Tadlock the full amount of the Contract Price, the Trustee as Trustee of the Estate has been damaged in the amount of $888,701.66, plus reimburseable costs and interest to be proven at trial.

202. The Government in addition wrongfully caused Tadlock to provide benefits to the Government under the Contract without properly executing applicable Modifications to Contract and with no intention to compensate Tadlock for time spent and for monetary expenditures made, in direct violation of applicable federal regulations, including but not limited to FAR 43.204, Administration, FAR 52.236-2, Differing Site Conditions; FAR 52.243-4, Changes; and FAR 52.243-5, Changes and Changed Conditions.

**SECOND CLAIM FOR RELIEF:**

**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

203. The Trustee incorporates herein by reference the allegations set forth in paragraphs 1 through 202 above, as though fully set forth herein.

204. Every contract contains an implied covenant of good faith and fair dealing, in which each party to the contract promises to give full cooperation to the other party in its performance under the contract, and to refrain from doing any act which would prevent or impede the other party from receiving the full benefit of its agreement, and to refrain from any act that would prevent or impede that party's' enjoyment of the fruits of that contract.

205. The Contract between Tadlock and the Government thus contained an implied covenant of good faith and fair dealing, by which the Government promised to give full cooperation to Tadlock in its performance under the Contract, and to refrain from doing any act which would prevent or impede Tadlock from receiving the full benefit of the Government's agreement with Tadlock, and to refrain from any act that would prevent or impede Tadlock's enjoyment of the fruits of the Contract. This covenant of good faith and fair dealing required the Government to fairly, honestly and reasonably perform the terms and conditions of its Contract with Tadlock.

206. The Government's failure to effectively and responsibly perform its obligations under the Contract with Tadlock was and is wrongful, in bad faith, and unfair, and therefore in breach of this covenant because Tadlock relied upon the Government' full and responsible performance when Tadlock entered into the Contract with the Government.

207. Based on information and belief, the Trustee alleges that the Government wilfully breached the Contract with Tadlock to force Tadlock into bankruptcy, thus enabling the Government to avoid performance of its obligations to Tadlock under the Contract.

208. As a direct, foreseeable and proximate result of the Government' breach of the covenant of good faith and fair dealing, the Estate has suffered and continues to suffer substantial monetary losses, damages and loss of other benefits as alleged above, all to the Estate's damage, and to the detriment of the creditors of the Estate, the precise amount of which will be proven at trial.

**PLAINTIFF'S DEMANDS**

WHEREFORE, by reason of the foregoing, the Trustee demands judgment as follows:

a. Finding that the Government breached the Contract with Tadlock, thereby causing damages to the Estate;

b. Awarding the Trustee damages in the amount of $888,701.66 plus additional interest calculated to the date of trial according to proof;

c. Awarding the Trustee costs allowed under Rule 54(d) of the Rules of this Court; and

d. For such other and further relief as the court deems appropriate.

Dated: July 7, 2004 By: [signature]

SPARBER RUDOLPH ANNEN, APLC
Richard J. Annen, Esq.
701 "B" Street, Suite 1000
San Diego, CA 92101-8109
Telephone: (619) 239-3600
Facsimile: (619) 239-5601
Attorneys for Plaintiff Leslie T. Gladstone, As Trustee of the William G. Tadlock, Inc. Bankruptcy Estate