**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **LESLIE T. GLADSTONE, AS TRUSTEE OF THE WILLIAM G. TADLOCK, INC. BANKRUPTCY ESTATE,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | No. 04-1145C<br>(Judge Nancy B. Firestone)<br>(ADR Senior Judge Bruggink) |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

# Plaintiff's Memorandum of Points and Authorities In Opposition to Defendant's Partial Motion for Summary Judgment

# Table of Contents

Page

Table of Authorities . . . . . . . . . . ii

Issues . . . . . . . . . . 1

Procedural History . . . . . . . . . . 1

Summary of Facts . . . . . . . . . . 2

1. Tadlock contracts with the Government to build a dining facility. . . . . . . . . . . 2

2. Tadlock immediately encounters unforeseen obstacles that impede construction. . . . . . . 2

3. Tadlock moves forward with the project while negotiations regarding the additional work is pending. . . . . . . . . . 5

4. After the contract modifications are executed, Tadlock and the Government continue to negotiate Tadlock's impact delay costs. . . . . . . . . . 6

Law Governing Summary Judgment Motions . . . . . . . . . . 8

Argument . . . . . . . . . . 10

1. The Government's motion is fatally flawed because it fails to dispose of an entire claim . . . . . . . . . . 10

2. The release provisions in the contract modifications do not bar Tadlock's delay damages. . . . . . . . . . 12

A. The Government must show that the parties intended for the release in the contract modifications to bar Tadlock's claims. . . . . . . . . . 12

B. Tadlock and the Government did not intend for the release provision to bar Tadlock's subsequent delay damage claims. . . . . . . . . . 19

Conclusion . . . . . . . . . . 22

# Table of Authorities

**Page**

## Cases

*A & K Plumbing & Mech. Inc. v. U.S.*,
1 Cl. Ct. 716 (1983) . . . . . . . . 14, 17

*Al-Kurdi v. U.S.*,
25 Cl. Ct. 599 (1992) . . . . . . . . 12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . 8

*Arado v. Gen'l Fire Extinguisher Corp.*,
626 F. Supp. 506 (N.D. Ill. 1985) . . . . . . . . 10

*C & H Commercial Contractors, Inc. v. U.S.*,
35 Fed. Cl. 246 (1996) . . . . . . . . 17, 18, 19, 22

*Calderone v. U.S.*,
799 F.2d 254 (6th Cir. 1986) . . . . . . . . 9

*Jackson Construction Co., Inc. v. U.S.*,
62 Fed. Cl. 84 (2004) . . . . . . . . 13, 14

*Kenbridge Construction Co. v. U.S.*,
28 Fed. Cl. 762 (1993) . . . . . . . . 14, 15, 16

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
182 F.3d 157 (2nd Cir 1999) . . . . . . . . 8, 9

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*,
210 F.3d 1099 (9th Cir. 2000) . . . . . . . . 9

*Ryco Construction, Inc. v. U.S.*,
55 Fed. Cl. 184 (2002) . . . . . . . . 13

*Securities & Exchange Commission v. Thrasher*,
152 F. Supp.2d 291 (S.D.N.Y. 2001) . . . . . . . . 10, 11

*Westerhold v. U.S.*,
28 Fed. Cl. 172 (1993) . . . . . . . . 13, 14

# Table of Authorities—Continued

Page

## Rules

Federal Rules of Civil Procedure,
Rule 56 . . . . . . . . . . 11

Rules of the United States Court of Federal Claims,
Rule 8(c) . . . . . . . . . . 12
Rule 56 . . . . . . . . . . 11
Rule 56(b) . . . . . . . . . . 8

## Issues

William G. Tadlock, Inc. ("Tadlock"), a commercial construction contractor, contracted to build a dining facility at Miramar Marine Corps Air Station in San Diego, California. In the course of the project, Tadlock encountered unforeseen obstacles, including differing site conditions and defective designs and specifications, that delayed the completion of the dining facility. With the Government's assurance that Tadlock's costs due to these delays would be negotiated at a later date, Tadlock executed several contract modifications and moved forward with the project. Tadlock eventually filed bankruptcy, and the Trustee took over the negotiations with the Government. When the parties were unable to reach an agreement as to Tadlock's delay damages, the instant lawsuit was filed. The Government now moves for partial summary judgment claiming that the release provision in some of the contract modifications bars a portion of the Trustee's claimed damages. This raises the following straightforward issues for the Court:

- **Motion not dispositive of the claims.** Rules of the United States Court of Federal Claims, Rule 56 does not allow for fragmented adjudication of non-determinative issues. Here, the Government's motion for partial summary judgment attacks only a portion of the Trustee's damages. Should the Court deny this improper motion because it fails to dispose of an entire claim?

- **Release not a bar to claims.** Despite the clear and unambiguous language of a release in a contract modification, the release will not preclude a contractor's subsequent claim if the evidence shows that the parties intended to except the claim from the release. Here, at the time Tadlock executed the contract modifications containing a release of all claims, Tadlock and the Government agreed that Tadlock's claim for an additional compensation due to the delays would be negotiated at a later date. After the contract modifications were executed, the Government asked Tadlock to submit its time proposal, and considered the proposal on its merits. Does the release preclude the Trustee's current claims?

## Procedural History

In 1998, Tadlock entered into a contract with the Navy to construct an enlisted dining facility at the Miramar Marine Corps Air Station in San Diego, California. Construction was completed, but

107 days later than originally scheduled. Extensive negotiations as to delay damages and responsibility for delay ensued, to no avail. Tadlock was ultimately forced to file bankruptcy, and the Bankruptcy Trustee of Tadlock's Bankruptcy Estate (the "Trustee"), who is the plaintiff in this litigation, filed a certified claim for $888,701.66 with the Government on March 13, 2003.

After further continued negotiations between the Trustee and the Government failed again to produce a resolution, the Trustee filed this action on July 13, 2004.

## Summary of Facts

### 1. Tadlock contracts with the Government to build a dining facility.

In February 1998, Tadlock and the Government entered into Contract No.N68711-94-C-1754, to to construct an enlisted dining facility at the Miramar Marine Corps Air Station in San Diego, California (the "Contract").[1] The Contract was initially scheduled to be completed by March 22, 1999.[2]

### 2. Tadlock immediately encounters unforeseen obstacles that impede construction.

Tadlock initiated construction activities in February 1998.[3] Almost immediately, Tadlock began to encounter significant obstacles impeding the progress of construction.

On March 12, 1998, Tadlock encountered quantities of buried cementous material on the project site.[4] The existence of these quantities of buried cementous materials had not been previously

[1] Plaintiff's [Proposed] Finding of Fact (after this "PFF") No. 1.

[2] PFF No. 2.

[3] PFF No.3.

[4] PFF No.4 & 5.

disclosed to Tadlock in the Government's Plans and Specifications.[5] Removal of this previously undisclosed cementous material necessitated Tadlock's use of heavier equipment that performed at a much slower rate.[6]

Then, on March 23, 1998, in the midst of excavation, Tadlock encountered a concrete ductbank that contained a live 12 KVA electrical line.[7] The Government had not previously disclosed the existence of that ductbank to Tadlock. That ductbank bisected the building site north to south, and prevented Tadlock from re-routing the other site utilities, as Tadlock was required to do according to the contract drawings.[8] The Government ordered a temporary fix which directed Tadlock to tunnel under the ductbank.[9] This effort further disrupted Tadlock's subcontractors, who were unable to properly gear up for the Project while Tadlock attempted to work under and around the ductbank.[10] But two weeks after telling Tadlock to tunnel under the ductbank, the Government ordered Tadlock to remove the ductbank altogether.[11]

On and after April 9, 1998, the Navy imposed a four-hour maximum water outage requirement,[12] which impeded Tadlock's ability to complete even an eight-hour work shift until isolation valves could be installed to overcome this impediment.[13]

---

[5] PFF No. 6.

[6] PFF No. 7.

[7] PFF No. 8.

[8] PFF No. 9 & 10.

[9] PFF No. 11.

[10] PFF No. 12.

[11] PFF No. 13.

[12] PFF No. 14.

[13] PFF No. 14.

On May 4, 1998, when Tadlock attempted to demolish the existing sewer line, Tadlock discovered that the sewer line was encased in concrete along with the water and storm drain lines. Tadlock's effort to demolish the sewer line ruptured the water line, requiring additional labor and material to repair that rupture.[14]

On May 27, 1998, while Tadlock was excavating for the building foundation, the Government told Tadlock that it wanted the building footings to bear on formational soil, although the contract documents did not require that detail.[15] The Government also informed Tadlock that it would require these footings to be filled with concrete slurry,[16] yet another detail that had not been included in the Project plans and specifications.[17]

Errors, insufficient details, and conflicts with other work in the Government's drawings disrupted progress numerous times and delayed the Masonry phase of the Project significantly.[18] Tadlock also needed to add control joints to the Masonry, which had been omitted in the Government's plans and specifications.[19]

Errors, omissions, discrepancies and contradictions in the plumbing, electrical, mechanical and food service drawings, plans and specifications caused disputes among the various subcontractors which took significant time and effort to resolve.[20]

Moreover, the contract plans and specifications failed to provide for adequate venting and

---

[14] PFF No. 15 & 16.

[15] PFF No. 17.

[16] PFF 18.

[17] PFF No. 18.

[18] PFF No. 19.

[19] PFF No. 20.

[20] PFF No. 21.

exhaust of the gas fired kitchen equipment, which impacted Tadlock's ability to close the roof structure.[21] These omissions prevented the completion of the metal decking and underlying structural support, which in turn prevented the placement of membrane roofing, preventing the closure of the building to the elements, and thus delaying the next phase of completing the building interior.[22]

Tadlock also itemized numerous errors, omissions, conflicts, and deficiencies in the electrical drawings in numerous field notices issued between February 10, 1999 and June 12, 1999. To mitigate delay, Tadlock performed the work to correct these problems prior to completion of negotiations on the contract modifications.

### 3. Tadlock moves forward with the project while negotiations regarding the additional work is pending.

Each time when one of these occasions for work beyond the scope of the Project plans and specifications arose, Tadlock completed the extra work on the understanding that it would be compensated.[23] On each occasion, the Government negotiated an adjustment in price but deferred the extension of the "Contract Performance Period," leading Tadlock to believe that Tadlock's excess costs for extended performance time would be negotiated at a later point in the contract performance period.[24] Tadlock therefore entered into Modifications of Contract Numbers 2 through 17 without agreeing to an extension of the Contract Performance Period, on the understanding that Tadlock's impact delay costs incurred for its additional performance time would be negotiated at a

[21] PFF No. 22.

[22] PFF No.s 24 & 25.

[23] PFF No. 26.

[24] PFF No. 27.

later time.[25]

Repeatedly throughout the course of the Project, Tadlock was called upon by the Government to perform work above and beyond the scope of the original plans and specifications for the Project[26]. Often the Government expected Tadlock to complete such work before the cumbersome Government approval process, culminating in the issuance of a signed Modification of Contract, could be completed.[27] At several "Partnering Session" workshops conducted among Tadlock, the Government, and representatives of Tadlock's principal subcontractors, the need for partnering was emphasized to expedite the project completion through cooperative efforts to mitigate delay.[28] These partnering efforts included the commencement and continuation of work beyond the scope of the Project plans and specifications, and thus subject to contract modifications, prior to the Government's final approval and execution of these modifications.[29] On most of these occasions Tadlock agreed, and moved forward with the work without a signed Modification, on the understanding that its delay damages would be negotiated later.[30]

### 4. After the contract modifications are executed, Tadlock and the Government continue to negotiate Tadlock's impact delay costs.

Through February 1999, and during the period when Tadlock and the Government negotiated and entered into Modifications to Contract No.'s 2 through 17, Tadlock worked on multiple phases of the Project with the understanding that additional damages for impact delay costs would be

[25]PFF No. 28.

[26]PFF No. 29.

[27]PFF No. 30.

[28]PFF No. 31.

[29]PFF No. 32.

[30]PFF No. 33.

negotiated at a later time, after the project was brought back onto track.

In executing Modifications of Contract No.'s 2 through 17, Tadlock's President, William G. Tadlock, therefore had no intention of waiving Tadlock's claims for additional impact delay cost damages, in executing those Modifications. Tadlock intended instead to cooperate with the Government in the spirit of partnering, as agreed to in their Partnering Sessions, to mitigate further delay and to keep the construction moving progressively, rather than halting construction each time a modification of contract was needed.

Tadlock submitted its cost proposal for $320,202 for Impact Delay Costs on February 19, 1999.[31] Because Tadlock and the Government continued to negotiate Tadlock's Impact Delay Costs after the February 19, 1999 submittal, they changed the release language on subsequent Modifications to Contract to confirm that the Modifications to Contract did not constitute a release of Tadlock's impact delay costs. Thus, starting with Modification of Contract No. A00019 executed by Tadlock on April 7, 1999 and by the Government on April 1999, the following revised language was set forth:

> "CONTRACTOR'S STATEMENT OF RELEASE"
>
> IN CONSIDERATION OF THE MODIFICATIONS(S) AGREED TO HEREIN AS COMPLETE EQUITABLE ADJUSTMENTS FOR THE Contractor'S "proposal(s) for adjustment", the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to the "proposal(s) for adjustment" except for time.[32]

This revised language shows that the Government and Tadlock did not intend the Modifications of Contract to release Tadlock's Impact Delay Cost claims.

Contrary to the Government's contention, Tadlock and the Government continued to negotiate

---

[31] PFF No. 37.

[32] PFF No. 41.

issues germane to Tadlock's impact delay damages, both during the period between February, 1998 and February, 1999, and after that period. The Government continued to meet with Tadlock, and sent correspondence responsive to Tadlock's claims, well after the completion of construction.

## Law Governing Summary Judgment Motions

A motion for partial summary judgment by a defendant under Rules of the United States Court of Federal Claims, Rule 56(b), must be denied unless the court determines that there is no genuine issue of material fact to be tried, and that the moving defendant is entitled to judgment as a matter of law.[33] Whether or not a factual issue is material is determined by examining the substantive law governing the issue.[34] A fact is material if the dispute might affect the outcome of the lawsuit.[35] To defeat a summary judgment motion, the party opposing the motion is not required to produce evidence sufficient to have the issue resolved in the nonmovant's favor. Instead, the nonmovant needs only to produce sufficient evidence to raise a dispute that requires the trier-of-fact to resolve the parties' differing versions.[36] The court is not to weigh the evidence and determine the truth on a motion for summary judgment, but only to determine whether there is a genuine issue to be resolved at trial.[37]

The moving defendant bears the burden of showing that there is no genuine dispute over a material issue of fact.[38] When the moving defendant would bear the burden at trial—i.e., when the

---

[33]*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2nd Cir 1999).

[34]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[35]*Id.*

[36]*Id.* at 249.

[37]*Id.*

[38]*Nationwide Life Ins. Co.*, 182 F.3d at 160.

defendant moves for summary judgment based upon an affirmative defense—the defendant must produce sufficient evidence for the court to find that no reasonable jury could find other than in favor of the defendant.[39] If the moving defendant fails to meet this initial burden, then the nonmoving plaintiff has no obligation to produce any evidence, even for issues on which the plaintiff would bear the burden of proof at trial.[40]

Summary judgment is "a drastic device" that "cuts off a party's right to present his case to the jury."[41] In evaluating the evidence the court must view the evidence in the light most favorable to the party opposing the motion, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[42] The court must also resolve all doubts as to the existence of a genuine issue of material fact against the movant.[43] This is especially true if the issue raised deals with "questions of motive, intent, and subjective feelings and reactions."[44] If, viewing the evidence in this generous light, the court finds that a dispute over a material fact exists, the court must deny the summary judgment motion and the case must proceed to trial.[45]

Here, as discussed more thoroughly below, the Government has failed to meet its burden as a moving defendant to show that no reasonable jury could find other than in its favor on its affirmative defense of accord and satisfaction.

---

[39] *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986).

[40] *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–1103 (9th Cir. 2000).

[41] *Nationwide Life Ins. Co.*, 182 F.3d at 160.

[42] *Id.* at 160–161.

[43] *Id.*

[44] *Id.* at 161.

[45] *Id.* at 160–161.

# Argument

## 1. The Government's motion is fatally flawed because it fails to dispose of an entire claim.

A partial summary judgment motion that does not seek a judgment as to an entire claim is improper.[46] For example, in *Arado v. Gen'l Fire Extinguisher Corp.*, the defendant sought partial summary judgment against the plaintiff's damage claims in the first count of the complaint for age discrimination.[47] The court denied the defendant's motion, finding that Rule 56 does not permit piecemealing of a single claim:

> Rules 56(a) and 56(b) simply do not permit the piecemealing of a single claim of the type of issue-narrowing sought here by [Defendant.] . . . despite Rule 56(a)'s reference to "all or any part" of a claim, the Rule authorizes only appealable "judgments" disposing of entire claims.[48]

Similarly, the plaintiff in *Securities & Exchange Commission v. Thrasher* moved for partial summary judgment, not on any particular claim in its entirety, but rather on certain elements of the claims asserted, arguing that it would focus the jury's attention at trial on the true material issues in dispute.[49] Like the *Arado* court, the *Thrasher* court also found that the motion was improper because it failed to dispose of an entire claim:

> Defendants Thrasher and Hirsh argue, among other things, that Plaintiff's motion is not proper, since it requests disposition of elements of a claim rather than judgment on a claim. This Court agrees. The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues. Subsection (a) of the Rule states that a party "seeking to recover *upon a claim, counterclaim, or cross-*

---

[46]*See, e.g., Securities & Exchange Commission v. Thrasher*, 152 F. Supp.2d 291, 295–297 (S.D.N.Y. 2001); *Arado v. Gen'l Fire Extinguisher Corp.*, 626 F. Supp. 506, 508–509 (N.D. Ill. 1985).

[47]*Arado*, 626 F. Supp. at 508.

[48]*Id.* at 509.

[49]*Securities & Exchange Commission,* 152 F. Supp.2d at 295.

> *claim* ..., may ... move ... for a summary judgment in the party's favor upon all or any part thereof." F.R.C.P. 56(a) (emphasis added). Furthermore, Subsection (c) states that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages", *see* F.R. Civ. P. 56(c). The clear implication is that the issue of liability is the only non-determinative issue which may be disposed of on summary judgment.[50]

In denying the plaintiff's partial summary judgment motion, the *Thrasher* court expressly rejected the plaintiff's argument that the language in Rule 56 authorizing a party to move for summary judgment on a claim or "any part thereof" allowed a partial summary judgment motion regarding an element of the claim because an element is a part of a claim.[51] The *Thrasher* court also noted that permitting such partial summary judgment motions would not further Rule 56's purpose of encouraging speedy resolution of cases, but would rather waste judicial resources by encouraging "numerous and repetitive motions seeking to resolve limited factual issues in a piecemeal fashion."[52]

Here, like the moving parties in *Arado* and *Thrasher* discussed above, the Government seeks partial summary judgment—not on an entire claim—but only on a certain elements of the Trustee's claims. Although the cases above analyzed summary judgment motions brought under Federal Rules of Civil Procedure, Rule 56, the language of Rules of the United States Court of Federal Claims, Rule 56 is essentially identical, and the analysis applies equally to the Government's instant motion. It is indisputable that the Government is not attempting to resolve the issue of its liability for breach of the contract. Instead, the Government is seeking to limit the Trustee's recoverable damages by claiming that Tadlock waived the right to recover some, although not all, of the damages the Trustee seeks in this lawsuit, by entering into accord and satisfaction agreements. So, even if the Government were successful on the merits of the claim that it sets forth in this motion, the

---

[50] *Id.*

[51] *Id.* at 296.

[52] *Id.* at 296, n. 2.

Government would not be entitled to a judgment in its favor on Tadlock's claims because the motion does not address the issue of the government's liability or show that its affirmative defense is a complete bar to the Trustee's claims. This type of fragmented adjudication of factual issues is not appropriate for summary judgment.

The Court should deny the instant motion, because the Government improperly seeks peicemeal resolution of certain elements of the Trustee's claims, rather than disposition of a claim in its entirety.

## 2. The release provisions in the contract modifications do not bar Tadlock's delay damages.

Not only is the Government's motion is procedurally defective, it is also without merit. Although the Government failed to plead accord and satisfaction as an affirmative defense as required by Rules of the United States Court of Federal Claims, Rule 8(c), the Government now asserts that a certain portion of Tadlock's delay damages are barred because the contract modifications are an accord and satisfaction.[53] The Government, with only a superficial analysis, claims that the contract modifications A00002 through A00017 constitute a valid accord and satisfaction, barring Tadlock's delay damages.

### A. The Government must show that the parties intended for the release in the contract modifications to bar Tadlock's claims.

Accord and satisfaction is an affirmative defense that the defendant bears the burden of proving at trial.[54] Thus, to successfully move for summary judgment based on the doctrine of accord and satisfaction, the moving defendant bears the burden of showing that no triable issue of fact exists as

---

[53] *See also Al-Kurdi v. U.S.*, 25 Cl. Ct. 599, 604 (1992)—"The general rule is that affirmative defenses are waived when not pleaded in the answer."

[54] R. OF U.S. CT. FED. CL. 8(c).

to any essential element of the affirmative defense.[55] To establish accord and satisfaction the defendant must show: (1) proper subject matter; (2) competent parties; (3) meeting of the minds of the parties; and (4) consideration.[56] If the defendant fails to establish any one of these elements, the defendant's summary judgment motion must be denied.[57]

The parties' intent controls in determining if there was a meeting of the minds sufficient to establish an accord and satisfaction.[58] Although an executed bilateral modification to a government contract containing a release provision can constitute an accord and satisfaction, the release provision will not constitute an accord and satisfaction if the release provision is ambiguous or limited in scope.[59] While the language in the release is the starting point of the court's analysis, the court must look beyond the contractual language to determine if the parties' objective manifestations of their intent demonstrate that they reached a meeting of the minds as to the release of additional claims.[60] This is particularly true where the defendant contends ambiguous language to constitute an accord and satisfaction.[61]

But even if the court finds that the language of the release provision is not ambiguous, the court can refuse to enforce the release on several grounds, including: mutual mistake, misrepresentation, or other circumstances in which the parties' conduct demonstrates an intent to allow additional

---

[55] *Ryco Construction, Inc. v. U.S.*, 55 Fed. Cl. 184, 194 (2002).

[56] *Id.*

[57] *Westerhold v. U.S.*, 28 Fed. Cl. 172, 174–175 (1993).

[58] *Ryco Construction, Inc.*, 55 Fed. Cl. 184 at 195.

[59] *Jackson Construction Co., Inc. v. U.S.*, 62 Fed. Cl. 84, 92 (2004).

[60] *Id.* at 92–93.

[61] *Id.* at 93.

claims.[62] The court can consider parol evidence to determine the parties' intent at the time they executed the release.[63] The court may also consider evidence of additional negotiations after the execution of the modification with the release provision.[64] As explained by the Federal Claims Court in *Jackson Construction Co., Inc. v. U.S.*, the Government's subsequent consideration of a contractor's claim on the merits is a strong indication that the parties ***did not intend*** for the release to bar that claim:

> The rationale in such instances is that "the Government's consideration of the merits of a claim, following the execution of a release, indicates that the parties did *not* intend the release to extinguish the claim, and hence did not bar the contractor's earlier claim." [Citation.][65]

Courts, relying on these principals, have consistently denied the Government summary judgment when the evidence raises a triable issue of fact as to whether there was a meeting of the minds between the parties regarding their intention to have the release provision bar any further claim by the contractor.

For example, the United States Court of Federal Claims denied the Government's summary judgment motion in *Kenbridge Construction Co. v. U.S.* because the contractor raised a triable issue of fact regarding whether the parties intended to exempt the contractor's claim from the release.[66] In *Kenbridge*, the contractor and the Government entered into a contract for the construction of a building at Fort Lee, Virginia.[67] The contract required the contractor to stockpile certain surplus

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* citing *Westerhold v. U.S.*, 28 Fed. Cl. 172, 175 (1993), quoting *A & K Plumbing & Mech. Inc. v. U.S.*, 1 Cl. Ct. 716, 723 (1983). Emphasis in original.

[66] *Kenbridge Construction Co. v. U.S.*, 28 Fed. Cl. 762, 768 (1993).

[67] *Id.* at 763.

material generated during the excavation of the building site and store it in on-site berms.[68] But the contractor was unable to store approximately 22,900 cubic yards of the material on-site, and as a result requested an $196,485.71 increase in the contract price to cover the costs for transporting and storing the surplus material off-site.[69] After the contractor had submitted a certified claim for the additional costs, which the contracting officer denied, the contractor executed a Payment Estimate with a release provision stating that, unless otherwise indicated on the release, the contractor released all claims and demands arising under the contract.[70] The contractor did not reserve its right to bring an additional claim based on its cost to transport and store the surplus material.[71]

When the contractor filed a complaint seeking an equitable adjustment of $196,485.71, the Government moved for summary judgment, claiming that the release barred the contractor's claim.[72] The contractor opposed the motion, claiming that the parties had committed a mutual mistake or obvious oversight in neglecting to reserve the claim in the release.[73] In support of its contention that the release did not bar the claim, the contractor submitted affidavits asserting that there was a "clear understanding" between the contractor and the Government that the release would not affect the contractor's equitable adjustment claim, and that the Government employees told the contractor's employees that the claim was exempted from the release.[74] The Government rebutted the contractor's evidence by submitting affidavits from government officials—including the contracting

---

[68] *Id.* at 764.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id* at 765.

[74] *Id.* at 765–766.

officer, and the project's team leader—stating that the contractor's affidavits were false and that there was no understanding that the contractor's equitable adjustment claim would be exempted from the release.[75]

The *Kenbrïdge* court denied the Government's summary judgment motion, reasoning that although the Government's position was supported by the evidence, the contractor's contentions were as well:

> In ruling on a summary judgment motion, however, "the weighing of the evidence, and the drawing of legitimate inferences from the facts are ... not [tasks] of a judge." [Citation.] While defendant's interpretation of the evidence certainly is plausible, plaintiff's argument also is justified in light of its own affidavits, which the court must accept as true for purposes of a summary judgment motion. [Citation.] The decision as to which interpretation should prevail "calls for full ventilation of the facts" at trial. [Citation.][76]

And although the *Kenbridge* court found the Government's affidavits compelling, particularly the denials of the contracting officer, the court also acknowledged that it could not make any credibility determinations when ruling on a summary judgment motion.[77] Instead, its only function was to determine if the contractor had presented sufficient evidence to raise a triable issue of fact, and the *Kenbridge* court found that the contractor had done so:

> Thus, the court finds that plaintiff's affidavits are sufficient to raise issues of fact as to whether the parties committed a mutual mistake in failing to except plaintiff's claim in the release and, if so, whether plaintiff's representatives reached the understanding to preserve plaintiff's claim with a federal official authorized to waive the release of claims against the government. Because these factual issues are material to the outcome of the instant case, summary judgment is precluded.[78]

---

[75]*Id.* at 766–767.

[76]*Id.* at 767.

[77]*Id.*

[78]*Id.* at 767–768.

Likewise, in *A & K Plumbing & Mechanical, Inc. v. U.S.*,[79] the contractor was hired to repair and remodel a housing project on the Marine Corps Base.[80] There was a dispute between the contractor and the Government as to whether the contract required to the contractor to revarnish all the kitchen cabinets, or only those that it performed repairs on.[81]

Nearly a year after the contractor submitted an estimate for what it considered to be supplemental refinishing work, the contractor settled the liquidated damage claim with the Government and signed a release that the Government claimed barred the contractor's claim for equitable adjustment.[82] The United States Claims Court rejected this argument, finding that there was no evidence of the intent of either party at the time the release was executed that the release would bar the contractor's claim for an equitable adjustment, as well as the liquidated damages claim that had been resolved by the parties.[83] The United States Claims Court also noted that both the contractor and the Government continued to consider the merits of the contractor's equitable adjustment claim after the release had been executed.[84] Under these circumstances, the court found that the release could not be a bar to the contractor's claim.[85]

Again, in *C & H Commercial Contractors, Inc. v. U.S.*, the United States Court of Federal Claims denied the Government's partial summary judgment motion, finding that the releases in the

---

[79] *A & K Plumbing & Mech. Inc. v. U.S.*, 1 Cl. Ct. 716 (1983).

[80] *Id.* at 718.

[81] *Id.*

[82] *Id.* at 723.

[83] *Id.*

[84] *Id.*

[85] *Id.*

various contract modifications did not bar the contractor's claims.[86] During renovation of an office building, the contractor encountered unforeseen cracking in the existing floor slabs exposing asbestos, which required increased time and costs for the asbestos abatement.[87] During the course of the renovations, the contractor executed numerous contract modifications that contained release provisions.[88]

The court found that the release provisions were unambiguous and would constitute an accord and satisfaction, absent fraud, duress, or misrepresentation by the Government.[89] But the contractor presented evidence—including deposition testimony of its president and vice-president, as well as a memorandum to the file written by the contracting officer—that supported the contractor's assertion that the contractor was told by the Government at the time it executed the contract modifications containing the releases that the releases were "standard" and would not preclude the contractor from later seeking delay and impact damages.[90] Based on this evidence, the court found that at the time the modifications were executed the parties did not intend for the release provisions to bar the contractor's delay damage claim.[91]

The court went on to find that Government induced the contractor to execute the contract modifications by misrepresenting the legal significance of the release provisions.[92] Based on this, the court granted the contractor's motion for partial summary judgment concerning the

---

[86] *C & H Commercial Contractors, Inc. v. U.S.*, 35 Fed. Cl. 246, 258 (1996).

[87] *Id.* at 249–250.

[88] *Id.* at 250–251.

[89] *Id.* at 251–253.

[90] *Id.* at 254–255.

[91] *Id.* at 255.

[92] *Id.* at 256–257.

Government's accord and satisfaction defense:

> [P]laintiff has met its burden under RCFC 56 with regard to defendant's affirmative defense of accord and satisfaction.
>
> We are faced with what we hope is an unusual factual situation—one in which government representatives promised a contractor that it would not be precluded from bringing future delay claims by signing a release and then asserted the release as a bar to such claims. Such conduct is outrageous.[93]

Like the Government's summary judgment motions in the above-discussed cases, the instant summary judgment motion must be denied because the Trustee's evidence raises a triable issue of fact regarding whether Tadlock and the Government intended for the release provision in the contract modifications to preclude Tadlock's subsequent claim for delay damages.

**B. Tadlock and the Government did not intend for the release provision to bar Tadlock's subsequent delay damage claims.**

It is indisputable that Tadlock contracted to build a dining facility at Miramar Marine Corps Air Station. It is equally indisputable that almost immediately upon beginning the construction process, Tadlock encountered unforeseen obstacles that delayed the construction. Some of these obstacles, such as the buried cementous material, were due to differing site conditions. Other of these obstacles were a result of the Government's defective designs and specifications. In any event, these obstacles significantly delayed Tadlock's completion of the dining facility and increased the cost of the project.

In an attempt to keep the project moving forward, both Tadlock and the Government agreed that work could continue during the time that the parties negotiated a modification to the contract. To this end, Tadlock and the Government met in "Partnering Sessions" to discuss the performance of, and compensation for, work that was beyond the scope of the original contract. As a result of these meetings, Tadlock and the Government executed numerous contract modifications. But at the time of these negotiations, Tadlock did not yet know the impact the new work outlined in the contract

---

[93] *Id.* at 257.

modifications would have on the time of performance. For that reason, the parties did not make any adjustments to the contract price to compensate Tadlock for delay costs. Instead, Tadlock and the Government agreed to resolve these issues at a later date.

Just as it did in the above-discussed cases, the Government now asserts that the plain language of the release provisions in certain of these contract modifications precludes the Trustee's instant claim for delay damages, since Tadlock did not expressly reserve the right to bring such claims. But the evidence is to the contrary. At the time that William Tadlock executed the subject contract modifications on Tadlock's behalf, he believed, as a result of his conversations with the government officials overseeing the project, that the contract modifications only addressed the additional compensation attributable to the additional work detailed in that particular modification, but did not include any adjustment in the contract price for delay damages. These claims were deferred for later negotiations.

Contrary to the Government's current assertions, this understanding was ***not one-sided***, as evidenced by the Government's conduct *after* the execution of the subject releases. For example, in a memorandum to the file dated December 27, 1999, Lieutenant Stephen Revelas—the Project Manager who oversaw the day to day progress of the project from December 1998 until its completion in July 1999—acknowledged that in January 1999, the Government and Tadlock had not resolved Tadlock's claim for additional compensation due to the delays. He thus requested that Tadlock submit a proposal covering the impact of all the modifications executed in 1998 by February 1, 1999, which was later extended to February 19, 1999:

> In January of 1999, I insisted that all modifications made in 1998 be resolved with respect to time. The resolution of time had been discussed during the partnering workshop on 8 December of 1998, but no action had been taken on the part of the contractor. [Tadlock] agreed to provide a full impact schedule proposal on 1 February. [Tadlock] was subsequently granted an extension to 19 February in order

to submit their time proposal.[94]

Revelas' December 27, 1999 memorandum further acknowledges that after receiving the proposal from Tadlock, the Government proceeded to analyze the proposal, consider it on its merits, and continue its negotiations with Tadlock:

> Their proposal was analyzed by Mike McGaw, Bruce Lyon (scheduler for DMJM), and myself over the ensuing weeks. A letter was sent to [Tadlock] in April requesting additional information regarding inconsistencies with their proposed schedule. A response to those questions was never received. I held meetings with [Tadlock's] Project Manager, Steve Tadlock, through early August to try to resolve our differences on their time proposal (see enclosure 2). Despite our efforts, resolution was not reached and on 10 August, the owner of [Tadlock] stated that he would submit a claim to the government.[95]

Revelas' recollection of events memorialized in his December 27, 1999 memorandum is confirmed by correspondence from other government officials. For example, on February 29, 2000, Mr. Joseph Angell sent a letter, acknowledging 72 days of delay but claiming only 32 days to be the sole responsibility of the government.[96] Angell's letter further claimed that Tadlock's analysis of all submitted delays was incomplete and suggested that Tadlock should be compensated for 32 days at $1,000 a day, a fraction of the actual daily costs claimed by Tadlock. Angell made allowance for 7 days of additional work due to "hard digging," as opposed to Tadlock's prior proof of 17 days of "hard digging" additional work. This letter shows that—although Tadlock and the Government disagreed as to the extent of the Government's responsibility for the delays, as well as the costs associated thereto—Tadlock and the Government were still negotiating these issues *long after* Tadlock executed the contract modifications, and in fact even after the project was completed.

Contrary to the Government's current position, the negotiations regarding Tadlock's additional

---

[94]PFF No. 49, Ex. E.

[95]*Id.*

[96] PFF No. 50, Ex. F.

damages continued long after the execution of the releases that the Government now relies on to bar Tadlock's current claims. The Government should not be allowed to entice Tadlock into continuing performance of the contract and executing contract modifications for work beyond the scope of the original contract by promising that the impact delay damages will be resolved at some later date, and then rely on the releases to bar Tadlock's claim for those damage. As noted by the *C & H Commercial Contractors, Inc.* court above, such conduct is outrageous.

## Conclusion

The Government's motion for partial summary judgment should be denied. First, the motion is procedurally defective because it only challenges a portion of Tadlock's damages, and could not dispense with an entire claim. Second, there is no merit to the Government's claim that the release provisions bar Tadlock's recovery of delay damages in this case. The indisputable evidence shows that at the time when those contract modifications were executed, ***both parties*** intended that Tadlock's claims for additional compensation due to the delay of the project would be resolved at a later date. Consistent with this understanding, the parties continued to negotiate these claims long after the contract modifications were executed. Under these circumstances, the Government cannot assert the release provisions as a bar to Tadlock's instant claim.

Dated: September 30, 2005

By: /s/ Richard J. Annen

SPARBER RUDOLPH ANNEN, APLC
Richard J. Annen, Esq.
701 "B" Street, Suite 1000
San Diego, CA 92101-8109
Telephone: (619) 239-3600
Facsimile: (619) 239-5601
Email: rannen@sparberlaw.com
Attorneys for Plaintiff Leslie T. Gladstone, As Trustee of the William G. Tadlock, Inc. Bankruptcy Estate

CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 2005, a copy of the foregoing Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Partial Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties of the record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Richard J. Annen