IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LESLIE GLADSTONE, AS TRUSTEE OF WILLIAM G. TADLOCK, INC. BANKRUPTCY ESTATE, | ) | |
| Plaintiff, | ) | 04-1145 C (Judge Nancy Firestone) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1. The Construction Contract

1. On or about February 7, 1998, William G. Tadlock, Inc. ("Tadlock") and the Government entered into Contract No. N68711-94-C-1754 to construct an enlisted dining facility at the Miramar Marine Corps Air Station in San Diego, California (the "Contract"). Declaration of William G. Tadlock ("WGT Dec."), 4; Declaration of Stephen M. Tadlock ("SMT Dec."), 3, 4.

DEFENDANT'S RESPONSE:

Agree.

2. The Contract was initially scheduled to be completed by March 19, 1999. WGT Dec., 4; SMT Dec., ¶ 4.

DEFENDANT'S RESPONSE:

Disagree. The original contract was scheduled to be competed by March 22, 1999. Gladstone II, 08418-08421. Appendix ("App.") 1.

2. Repeated Obstacles Required Additional Work and Impeded the Progress of Construction

3. Tadlock initiated construction activities in February 1998. WGT Dec., 6; SMT Dec., 6

DEFENDANT'S RESPONSE:

Agree. The contract specified the start date as February 28, 1998. We have no reason to question that Tadlock began work in February 1998.

4. Almost immediately, Tadlock began to encounter significant obstacles impeding the progress of construction. WGT Dec, 6; SMT Dec., 6.

DEFENDANT'S RESPONSE:

Disagree. The earliest mention of this issue was on March 12, 1998, in Field Notice 1. Gladstone II 07252. App. 2. If plaintiff is referring to the ductbank, it was mentioned in an e-mail to the Navy dated March 9, 1998. Gladstone II 04393. App. 4.

5. On March 12, 1998, Tadlock encountered quantities of buried cementous material on the project site. WGT Dec., 7; SMT Dec., 7.

DEFENDANT'S RESPONSE:

Agree.

6. The existence of these quantities of buried cementous materials had not been previously disclosed to Tadlock in the Government's Plans and Specifications. WGT Dec., 7 ; SMT Dec., 7.

DEFENDANT'S RESPONSE:

Disagree. The presence of hard cementitous materials was evident from the boring test provided at bid stage to all contractors Drawing GT-1 000000031 (not included) and Gladstone

II 01847 and 01860. App. 3.

7. Removal of this previously undisclosed cementous material necessitated Tadlock's use of heavier equipment that performed at a much slower rate. WGT Dec., 7; SMT Dec., 7.

DEFENDANT’S RESPONSE:

Disagree. Boring tests clearly show that the site contained soils that have standard penetration resistance greater than 60 per 300 mm. According to contract specification Section 02302 Paragraph 1.2.6, these soil types require “heavy excavation equipment with ripper teeth or the use of jack hammers for removal.” Based on this information, the Contractor should have already included such equipment and associated work hours in his bid. Drawing GT-1 000000031 (not included) and Gladstone II 01847, 01860. App. 3.

8. On March 23, 1998, in the midst of excavation, Tadlock encountered a concrete ductbank that contained a live 12 KVA electrical line. WGT Dec., 8; SMT Dec., 8.

DEFENDANT’S RESPONSE:

Disagree. While the ductbank was encountered by Tadlock, the exact date is unknown. The ductbank was mentioned in an e-mail to the Navy dated March 9, 1998. Gladstone II 04393. App. 4.

9. The Government had not previously disclosed the existence of that ductbank to Tadlock. WGT Dec., 8; SMT Dec., 8.

DEFENDANT’S RESPONSE:

Agree.

10. That ductbank bisected the building site north to south, and prevented Tadlock from re-routing the other site utilities, as Tadlock was required to do according to the contract drawings. WGT Dec., 8; SMT Dec., 8.

DEFENDANT'S RESPONSE:

Agree.

11. The Government ordered a temporary fix which directed Tadlock to tunnel under the ductbank. WGT Dec., 8; SMT Dec., 8.

DEFENDANT'S RESPONSE:

Agree.

12. This effort further disrupted Tadlock's subcontractors, who were unable to properly gear up for the Project while Tadlock attempted to work under and around the ductbank. WGT Dec., 8; SMT Dec., 8.

DEFENDANT'S RESPONSE:

Disagree. Tadlock's subcontractors worked on a variety of activities during the week of March 23, 1998, and were disrupted by rainy weather during the next two weeks. For example, on each day during the period between March 25, 1998, and April 7, 1998, Tadlock reported rainy weather and/or work on a water-related activity, such as pumping, dewatering, covering soil piles, diverting run-off water, etc. Gladstone II D011233-59. App. 5.

13. Two weeks after telling Tadlock to tunnel under the ductbank, the Government ordered Tadlock to remove the ductbank altogether. WGT Dec.,18 ; SMT Dec., 8.

DEFENDANT'S RESPONSE:

Agree.

14. On and after April 9, 1998, the Navy's imposed a four-hour maximum water outage requirement, which impeded Tadlock's ability to complete even an eight-hour work shift until isolation valves could be installed to overcome this impediment. WGT Dec., 9; SMT Dec., 9.

DEFENDANT'S RESPONSE:

Disagree. There is no evidence that a four-hour limit impeded Tadlock's ability to complete eight hour work shifts. Tadlock's mechanical subcontractor completed eight-hour work shifts every weekday during the two weeks after April 9, 1998. Gladstone II D017683-98. Moreover, the Navy granted Tadlock relief from the outage requirements in the contract specifications by allowing four-hour water outages during normal working hours. Gladstone II 01735-01736; Gladstone II D012081. App. 6.

15. On May 4, 1998, when Tadlock attempted to demolish the existing sewer line, Tadlock discovered that the sewer line was discovered encased in concrete along with the water and storm drain lines. WGT Dec., 10; SMT Dec., 10.

DEFENDANT'S RESPONSE:

Agree that Tadlock attempted to demolish the existing sewer line and that Tadlock discovered that the sewer line was encased in concrete along with the water and storm drain lines. There is no document establishing the dates that this occurred.

16. Tadlock's effort to demolish the sewer line ruptured the water line, requiring additional labor and material to repair that rupture. WGT Dec., 10; SMT Dec., 10.

DEFENDANT'S RESPONSE:

Agree.

17. On May 27, 1998, while Tadlock was excavating for the building foundation, the Government told Tadlock that it wanted the building footings to bear on formational soil, although the contract documents did not require that detail. WGT Dec., 11; SMT Dec., 11.

DEFENDANT'S RESPONSE:

Disagree. The project specification clearly requires the confirmation of the soil conditions by the site engineer before any foundation work starts. Gladstone II 01853 - 01854. App. 7.

18. The Government also informed Tadlock that it would require these footings to be filled with concrete slurry, yet another detail that had not been included in the Project plans and specifications. WGT Dec., 11; SMT Dec., 11.

DEFENDANT'S RESPONSE:

Disagree. The contract specifications clearly state that the site engineer has the authority to require extra excavation until all unsatisfactory soil is removed under the footings. Gladstone II 01853 - 01854. App. 7. Tadlock and the Government agreed that founding footings on formational soil and using the concrete slurry backfill was in the best interest of the parties. Gladstone II 06150 – 06151. App. 8. This additional excavation and filling with concrete slurry was not in the original scope. Tadlock was paid for its additional work. Drawings imply that footings needed to be on undisturbed natural soil or engineered fill. Slurry could be considered as engineered fill.

19. Errors, insufficient details, and conflicts with other work in the Government's drawings disrupted progress numerous times and delayed the Masonry phase of the Project by at least 32 days. WGT Dec., 12; SMT Dec., 12.

DEFENDANT'S RESPONSE:

Disagree. The masonry phase of the project was delayed by only three days. The project was already 39 days behind schedule upon completion of the concrete footings, which were required prior to the masonry phase. The masonry phase was completed 42 days behind schedule, which was only three days further behind than at the start of the masonry phase. April 10, 1998 Schedule Submittal, Gladstone II 14397; May 22, 1998 Early Finish Date for "Place Concrete Footing" Gladstone II 14437; June 30, 1998 [39 days later] completion of concrete footing, Gladstone II D011025-26; July 7, 1998 Early Finish Date for "Masonry Walls" Gladstone II 14437; August 18, 1998 [42 days later] completion of masons placing CMU, Gladstone II D010835-44. App. 9.

20. An additional 5 days was needed as well to add control joints to the Masonry, which had been omitted in the Government's plans and specifications. WGT Dec., 12; SMT Dec., 12.

DEFENDANT'S RESPONSE:

Disagree. The inclusion of control joints to the masonry was covered by modification A13, a bilateral modification with a full release that compensated Tadlock for all costs associated with the added work. Gladstone II 13213-13214. App. 10. Moreover, the masonry phase of the project was delayed by only three days. See Response to Proposed Finding of Fact No. 19.

21. Errors, omissions, discrepancies and contradictions in the plumbing, electrical, mechanical and food service drawings, plans and specifications caused disputes among the various subcontractors which took at least 120 days to resolve. WGT Dec., 13; SMT Dec., 13.

DEFENDANT'S RESPONSE:

Disagree. The opinion of the Government's scheduling expert is to the contrary.

22. The contract plans and specifications failed to provide for adequate venting and exhaust of the gas fired kitchen equipment, which impacted Tadlock's ability to close the roof structure. WGT Dec., 14; SMT Dec., 14.

DEFENDANT'S RESPONSE:

Disagree. Contract drawings did not show flue lines for food service equipments 32, 37, and 61. However, the required gas flues are clearly indicated in the contract specifications and in the food service schedule. Gladstone II 02255 – 02257, 02265, and 00069 (not included). App. 11.

23. These omissions prevented the completion of the metal decking and underlying structural support, which in turn prevented the placement of membrane roofing, preventing the closure of the building to the elements, and thus delaying the next phase of completing the building interior. WGT Dec., 14; SMT Dec., 14.

DEFENDANT'S RESPONSE:

Disagree. The required gas flues are clearly indicated in the contract specifications and in the food service schedule. See Response to Proposed Finding of Fact No. 22.

24. Tadlock itemized numerous errors, omissions, conflicts, and deficiencies in the electrical drawings in numerous field notices issued between February 10, 1999 and June 12, 1999. WGT Dec., 15; SMT Dec., 15.

DEFENDANT'S RESPONSE:

Disagree. While numerous Field Notices pertined to allegations related to electrical connection of food service equipment between February 10, 1999 and June 12, 1999, in the opinion of the Goverment's engineering expert that did not all constitue "errors, omissions, conflicts, and deficiencies."

25. To mitigate delay, Tadlock performed the work to correct these problems prior to completion of negotiations on the contract modifications. WGT Dec., 15; SMT Dec., 15.

DEFENDANT'S RESPONSE:

Agree that in some cases Tadlock performed some work to correct certain problems prior to completion of negotiations on the contract modifications.

3. The Government Granted Tadlock No Time Extension for Completion of this Additional Work.

26. Each time when one of these occasions for work beyond the scope of the Project plans and specifications arose, Tadlock completed the extra work on the understanding that it would be compensated. WGT Dec., 19; SMT Dec., 15,18,19.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

27. On each occasion, the Government negotiated an adjustment in price but deferred the extension of the "Contract Performance Period," leading Tadlock to believe that Tadlock's excess costs for extended performance time would be negotiated at a later point in the contract performance period. WGT Dec., 20; SMT Dec., 20.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

28. Tadlock therefore entered into Modifications of Contract Numbers 2 through 17 without agreeing to an extension of the Contract Performance Period, on the understanding that Tadlock's impact delay costs incurred for its additional performance time would be negotiated at a later time. WGT Dec., 19, 21; SMT Dec., 18, 19, 20.

DEFENDANT'S RESPONSE

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

4. Tadlock Worked without Signed Contract Modifications to Mitigate Delay.

29. Repeatedly throughout the course of the Project, Tadlock was called upon by the Government to perform work above and beyond the scope of the original plans and specifications for the Project. WGT Dec., 18, 19, 20; SMT Dec., 18, 19, 20.

DEFENDANT'S RESPONSE:

Disagree. While there were occasions where the contractor had to perform work beyond the scope of the original contract, these occasions were not as frequent as the word "repeatedly" implies. Moreover, the contractor was compensated for the extra work through bilateral contract

modifications.

30. Often the Government expected Tadlock to complete such work before the Government cumbersome approval process, culminating in the issuance of a signed Modification to Contract, could be completed. WGT Dec., 17; SMT Dec., 17,18, 19, 20.

DEFENDANT'S RESPONSE:

Disagree. The compensation through a signed contract modification came after the completion of additional work as the negotiations on the fairness and the accuracy of the associated costs would have delayed the completion of the additional work.

31. At several "Partnering Session" workshops conducted among Tadlock, the Government, and representatives of Tadlock' s principal subcontractors, the need for "partnering" was emphasized to expedite the project completion through cooperative efforts to mitigate delay. WGT Dec., 16, 18; SMT Dec., 16, 18.

DEFENDANT'S RESPONSE

Agree.

32. These "partnering" efforts included the commencement and continuation of work beyond the scope of the Project plans and specifications, and thus subject to contract modifications, prior to the Government's final approval and execution of these modifications. WGT Dec., 18; SMT Dec., 18.

DEFENDANT'S RESPONSE:

Agree. The contractor was compensated for the extra work.

33. On most of these occasions Tadlock agreed and moved forward with the work on the understanding that its delay damages would be negotiated later. WGT Dec., 7, 8, 9, 10, 11, 12, 13, 14, 17, 18, 19; SMT Dec., 118, 19.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

5.Tadlock Did Not Waive Its Damages for Delay.

34. Up to and until February 1998, and during the period when Tadlock and the Government negotiated and entered into Modifications to Contract No.'s 2 through 17, Tadlock worked on multiple phases of the Project with the understanding that additional damages for impact delay costs would be negotiated at a later time, after the project was brought back onto track. WGT Dec., 17, 18, 19; SMT Dec., 117, 18, 19.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

35. In executing Modifications of Contract No.'s 2 through 17, Tadlock's President, William G. Tadlock, had no intention of waiving Tadlock' s claims for additional impact delay cost damages. WGT Dec., 20, 21, 22, 23; SMT Dec., 20, 21.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

36. Mr. Tadlock intended instead to cooperate with the Government in the spirit of "partnering," as agreed to in their "Partnering Sessions," to mitigate further delay and to keep the construction moving progressively, rather than halting construction each time a modification of contract was needed and thereby compounding, rather than mitigating further delay. WGT Dec., 24; SMT Dec., 18.

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

37. Tadlock submitted its cost proposal for $320,202 for Impact Delay Costs on February 19, 1999. WGT Dec., 25; SMT Dec., 22, 23.

DEFENDANT'S RESPONSE:

Agree.

38. Both Tadlock, and the Government understood that Tadlock's claim for Impact Delay Costs remained unresolved during the entire period of time between November 1998 through December 1999. Memorandum to File dated 27 December 1999 written by LT Stephen Revelas, Project Manager and Assistant Resident Officer in Charge of Construction (Exhibit "A"). See also WGT Dec., 26; SMT Dec., 23.

DEFENDANT'S RESPONSE:

Disagree. In his memorandum to file, LT Stephen Revelas simply provided a summary of his conversations and correspondence with Tadlock, starting around the time he took over as Project Manager in late 1998. Gladstone II 01148 - 01150. App. 12. Moreover, Tadlock's claim for "Impact Delay Costs" could not have been unresolved in November 1998 because it was not

submitted until February 1999. Gladstone II 03785. App. 13.

39. Both Tadlock, and the Government understood that Tadlock's claim for Impact Delay Costs remained subject to negotiation during the entire period of time between November 1998 through December 1999. Memorandum to File dated 27 December 1999 written by LT Stephen Revelas, Project Manager and Assistant Resident Officer in Charge of Construction (Exhibit "A"). See also WGT Dec., 26; SMT Dec., 23.

DEFENDANT'S RESPONSE:

Disagree. In his memorandum to file, LT Stephen Revelas simply provided a summary of his conversations and correspondence with Tadlock, starting around the time he took over as Project Manager in late 1998. Gladstone II 01148 - 01150. App. 14. Moreover, Tadlock's claim for "Impact Delay Costs" could not have been subject to negotiation in November 1998 because it was not submitted until February 1999. Gladstone II 03785. App. 13.

40. The Government and Tadlock entered into an agreement on, and after January 12, 1999, "to address time and delay impacts to the subject project." Correspondence from K. Valentine, Contracting Officer, to Tadlock dated 17 August 1999 (Exhibit "B"). See also WGT Dec., 26; SMT Dec., 23.

DEFENDANT'S RESPONSE:

Agree. The Government and Tadlock entered into an agreement to address time and delay impacts but not delay costs.

41. The negotiations between Tadlock and the Government on Tadlock's time and delay impact costs, which began as early as January 1999, continued and remained unresolved through August 17, 1999. Correspondence from K. Valentine, Contracting Officer, to Tadlock

dated 17 August 1999 (Exhibit `B"). See also WGT Dec., 26; SMT Dec., 23.

DEFENDANT'S RESPONSE:

Disagree. The correspondence from K. Valentine to Tadlock refers to "time and delay impacts to the subject project" not "time and delay impact costs." Gladstone II 01153. App. 14.

42. Starting with Modification of Contract No. A00019 executed by Tadlock on April 7, 1999 and by the Government on April 9, 1999, the following new language was set forth in Modifications of Contract entered into between Tadlock and the Government, to confirm that Tadlock did not waive its claim for impact delay costs: "CONTRACTOR'S STATEMENT OF RELEASE" IN CONSIDERATION OF THE MODIFICATIONS(S) AGREED TO HEREIN AS COMPLETE EQUITABLE ADJUSTMENTS FOR THE Contractor's "proposal(s) for adjustment", the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to the "proposal(s) for adjustment" except for time. WGT Dec., 28; SMT Dec., 25; Exhibit "G".

DEFENDANT'S RESPONSE:

Disagree. The bilateral contract modifications include all costs, including delay costs, associated with the work covered by the modifications.

6. Negotiations for Impact Delay Damages Continued.

43. Tadlock and the Government continued to negotiate issues germane to Tadlock's impact delay damages, both during the period between February, 1998 and February, 1999, and after that period. WGT Dec., 29; SMT Dec., 26; Exhibits A, B, C, D, E, F.

DEFENDANT'S RESPONSE:

Disagree. According to LT. Revelas's memorandum to file on December 27, 1999, the Government and the contractor had a discussion on resolving the time issues in the Partnering Session on December 8, 1998, but the contractor did not take any action at that time. The negotiations on time issues did not start at least until after December 8, 1998. Gladstone II 01148 – 01150. App. 12.

44. The Government continued to meet with Tadlock, and sent correspondence responsive to Tadlock's claims, well after the completion of construction. WGT Dec., 29; SMT Dec., 26; Exhibits A, B, C, D, E, F.

DEFENDANT'S RESPONSE:

Agree.

45. On April 30, 1999, the Government, through its Assistant ROICC and Project Manager Stephen K. Revelas, acknowledged to Tadlock that seventy (70) days' impact delay was subject to negotiation. Exhibit "A"

DEFENDANT'S RESPONSE:

Disagree. In his letter to Tadlock, LT Revelas identifies 70 calendar days of "inexplicable changes to [Tadlock's] schedule" and asks for an explanation. There is no explicit mention that there is an ongoing "negotiation" of these days, although it is clear that information

still is being exchanged. Exhibit A to Plaintiff's Opposiiton.

46. On June 1, 1999, the Government, through its Assistant ROICC and Project Manager Stephen K. Revelas, acknowledged the continuing negotiations over Tadlock's Impact Delay Costs and relieved Tadlock of Liquidated Damages through April 20, 1999. Exhibit "B"

DEFENDANT'S RESPONSE:

Disagree. In the referenced letter from the Navy to Tadlock, the Government does not acknowledge "continuing negotiations" over Tadlock's "Impact Delay Costs." Instead, the letter states that Tadlock has not responded to a previous Navy letter and that the Government has proceeded with its analysis without the benefit of a response from Tadlock. Exhibit "B"to Plaintiff's Opposition.

47. On August 17, 1999, the Government, though its Contracting Officer K. Valentine, acknowledged that negotiations as to Tadlock' s time and delay impacts remained ongoing. Exhibit "C"

DEFENDANT'S RESPONSE :

Agree.

48. On December 7, 1999, the Government, through its Assistant ROICC and Project Manager Stephen K. Revelas, acknowledged that negotiations over Tadlock's Impact Delay Costs were continuing. Exhibit "D"

DEFENDANT'S RESPONSE:

Disagree. LT Revelas's memo to file indicates that he and Tadlock were to resume coordinated analysis of the project to arrive at a number of compensable days, as well as a number of days of liquidated damages. The memo does not refer to "Impact Delay Costs."

Exhibit D to Plaintiff's Opposition.

49. On December 27, 1999, the Government acknowledged the duration and history of its negotiations over Tadlock's time and delay impact damages through a three-page Memorandum to File written by its Assistant ROICC and Project Manager Stephen K. Revelas: 1.) acknowledging 74 days' delay; 2.) admitting to 32 days' delay as the sole responsibility of the Government; 3.) concluding that the Government had withheld $112,000 from the funding for the Contract pending resolution of Tadlock's impact delay damages ; and 4.) concluding in addition that Tadlock should still be allowed to invoice an additional total of $35, 253. Exh. "B"

DEFENDANT'S RESPONSE:

Disagree. This memorandum is internal to the Government for the purpose of informing a successor to Stephen Revelas of issues and analyses related to delays on the project. It does not constitute a formal "acknowledgment" nor is it necessarily based on a complete analysis of all relevant facts. It apparently is made without benefit of Tadlock's assessment of delay issues. The summary in the pleading does not address all issues summarized in the memorandum, failing to specifically mention liquidated damages although properly quoting the recommended amount of a potential final invoice.

50. On February 29, 2000, the Government through J. A. Angell II acknowledged that "The time or delay issue is the largest and most controversial item still outstanding on this contract" and admitted that the Government was responsible for seventy-two (72) days of that delay. Exhibit "F"

DEFENDANT'S RESPONSE:

Disagree. This letter from the Navy to Tadlock states a "position" on the matter of

schedule. The letter's reference to 72 days is as follows: "Our position is that the Government impacted the schedule causing a 72 calendar day delay that was concurrent with delays caused by your firm." Exhibit "F" to Plaintiff's Opposition.

51. The Government withheld $112,000 of funds budgeted for completion of the Contract pending resolution of Tadlock's Impact Delay Damages claim. Exhibit "E", p.3.

DEFENDANT'S RESPONSE

Agree.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

/s Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

October 20, 2005

Attorneys for Defendant